## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | | |
|---|---|---|
| TOM RILEY, HEATHER SHRUM, GARY AMBROSE, AND SHERRY KILBURN, individually, and on behalf of all others similarly situated, | ) ) ) ) ) ) | Case No.: 6:22-cv-499 CLASS REPRESENTATION |
| Plaintiffs, | ) ) ) | INJUNCTIVE RELIEF REQUESTED |
| vs. | ) ) | |
| GENERAL MOTORS LLC, | ) ) | |
| Defendant. | ) ) ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR

## JURY TRIAL

## INTRODUCTION

1.      Plaintiffs Tom Riley, Heather Shrum, Gary Ambrose, and Sherry Kilburn (collectively, "Plaintiffs") bring this putative class action complaint against Defendant General Motors LLC ("Defendant" or "GM").

2.      Plaintiffs bring this action individually and on behalf of all others similarly situated and allege upon personal knowledge, information, and belief that Defendant is liable to them and the proposed Class under federal and state law for the design, manufacturing, marketing, and sale of vehicles with defective paint.

1

3.      The vehicles at issue in this litigation include, but may not be limited to, the 2015-2019 Chevrolet Tahoe, 2015-2019 Chevrolet Suburban, 2014-2019 Chevrolet Silverado, 2015-2019 GMC Yukon, 2015-2019 GMC Yukon XL, and 2014-2019 GMC Sierra ("Class Vehicles).[1]

4.      This action is brought to remedy violations of law in connection with Defendant's designing, manufacturing, marketing, advertising, selling, warranting, and servicing of the Class Vehicles.  The Class Vehicles were all painted by Defendant, and the paint has a serious latent defect that causes the exterior surfaces of the Class Vehicles to peel and delaminate without any external or environmental influence.

5.      Defendant knew, or should have known, prior to Plaintiffs' purchases that the paint itself (and any clear coating) was defective, and that its application of the defective paint (and any clear coating) further contributed to the peeling and delamination. Although the peeling and delamination manifested over time, Defendant knew or should have known of those issues prior to sale of the Class Vehicles; yet Defendant continued to put the latently defective Class Vehicles on the market.

---

[1] This list includes all affected models and model years, upon information and belief, and discovery will enable Plaintiffs to precisely determine which model-years share the same uniform (and uniformly defective) paint.

6.     Defendant breached its express by continuing to sell the defective Class Vehicles and refusing to remedy the issues; instead, it actively concealed them from Plaintiffs and the putative class.

7.     Defendant also was unjustly enriched at Plaintiffs' expense and fraudulently suppressed the issues with the paint on the Class Vehicles in violation of various state consumer protection laws.

**PARTIES**

8.     Plaintiff Tom Riley ("Riley") is an adult resident and citizen of Pinellas County, Florida.

9.     Plaintiff Heather Shrum ("Shrum") is an adult resident and citizen of Clay County, Florida.

10.    Plaintiff Gary Ambrose ("Ambrose") is an adult resident and citizen of Orange County, Florida.

11.    Plaintiff Sherry Kilburn ("Kilburn") is an adult resident and citizen of Lawrence County, Tennessee.

12.    Defendant is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in

the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation with its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.

13.    Defendant designed, manufactured, marketed, distributed, sold, leased, and warranted the vehicles at issue.  Defendant also developed and disseminated the manuals, warranty booklets, advertisements, and promotional materials relating to the Class Vehicles.  It took those actions to distribute Class Vehicles for sale in the states at issue, purposely availing itself of the laws of those states and accounting for the purchase or lease of the Class Vehicles by the Plaintiffs and Class.

## **JURISDICTION AND VENUE**

14.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

15.    This Court also has federal question jurisdiction over this action under 28 U.S.C. § 1331 because this case includes claims arising under federal law.

16.    This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367(a).

17.     This Court has personal jurisdiction over Defendant because it is authorized to do business in this judicial district, conducts substantial business in the judicial district, and some of the actions giving rise to the complaint took place in the judicial district. Each of these facts independently, but also all of these facts together, are sufficient to render the exercise of jurisdiction by this Court over Defendant permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because Defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTS

### A. Riley's Facts

19.      In October 2016, Riley purchased a new 2016 Green Chevrolet Suburban, Vehicle Identification No. 1GNSKJKC6GR315396 from AutoNation Chevrolet South in Clearwater, Florida.

20.     AutoNation Chevrolet South in Clearwater, Florida is an authorized Chevrolet dealership.

21.     At the time Riley purchased his vehicle, it was new and came with a standard Chevrolet three year 36,000-mile new vehicle bumper to bumper express limited warranty.

22.     One of the main and important reasons for Riley selecting his Class Vehicle was the paint which Defendant touted extensively to him as superior, of professional grade, and containing a clear coat which protected his vehicle.

23.     Prior to his purchase, and mainly in early to mid-2016, Riley saw Defendant's newspaper, magazine, social media, and television ads touting that the Class Vehicles both new and used were reliable, endurable, of good finish, of high fit, of professional grade, and exceptional quality.  Plaintiff relied on Defendant's representations in making his purchase.

24.     The warranty Riley received is the same as the one each Class Member received, whether they purchased their vehicle directly through Defendant or through a subsequent used-car retailer.

25.     Riley's Class Vehicle has not been wrecked nor has it been repainted – it has the original paint from Defendant's factory.

26.     Riley purchased his Class Vehicle for his personal, family, and household use.

27.     His Class Vehicle was not exposed to any unexpected airborne or environmental influences which would have adversely affected its paint.

28.     Riley expected his Class Vehicle to be of good and merchantable quality, and not defective. He had no reason to know, or expect, that the paint on his

Class Vehicle was defective.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

29.     Riley first experienced problems with the paint on his Class Vehicle in mid-2019, while his car was

30.     The paint and clear coat condition continued to deteriorate and in May 2021, when it was obvious that there was a systemic problem with his paint, Riley took his Class Vehicle to the AutoNation authorized Chevrolet dealership in Clearwater, Florida.  The dealership acknowledged that there was an issue with his paint but Defendant declined warranty coverage.

31.     Instead of repairing or replacing the paint under warranty, Defendant agreed to pay only $1,000 of the total estimate of $3,000 to repair and/or replace the defective paint.

32.     During the May 2021 visit, dealership personnel acknowledged that the paint was defective and that they were aware of multiple other similar vehicles having the same problem.  However, Defendant denied warranty coverage.

33.     The paint continued to get worse showing defects in many body panels.

34.     Today, to repair and repaint Riley's Class Vehicle, he would have to pay more than $10,000.  Repainting the car would require sanding the vehicle to the bare metal and would substantially depreciate the value of the vehicle.  There is no short cut – the Class Vehicles must be sanded and repainted.

35.     The same defective paint and clearcoat was applied to all Class Vehicles.

36.     Ultimately, Defendant has refused to repair or replace Riley's vehicle, despite acknowledging the common defect.

37.     Although it is difficult to see the extent of the defect via pictures, the following pictures show Riley's paint today and the obvious defects:







38.     Riley's vehicle is just one of thousands of Class Vehicles that suffer from an irreparable defect in the exterior paint that results in peeling, flaking, bubbling, erosion, and microblistering of the clearcoat.

39.     Riley expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the paint on his Class Vehicle was defective. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

40.     Riley would purchase another vehicle of Defendant if Defendant is ordered to correct its paint defects and to ensure future defects are not concealed.

## B. **Shrum's Facts**

41.     In May 2016, Shrum purchased from Courtesy Chevrolet in San Diego, CA, a Chevrolet authorized dealer, a 2015 Chevrolet Tahoe with VIN 1GNSCBKC9FR248827.

42.     At the time Shrum purchased her Class Vehicle, it came with a standard Chevrolet three year 36,000-mile new vehicle bumper to bumper express limited warranty.

43.     The warranty Shrum received is the same as the one each Class Member received, whether they purchased their vehicle directly through Defendant or through a subsequent used-car retailer.

44.     One of the main and important reasons for Shrum selecting her Class Vehicle was the paint which Defendant touted extensively as superior, of professional grade, and containing a clear coat which protected her Class Vehicle.

45.     Prior to her purchase, and primarily in early 2016, Shrum saw magazine, internet, and television ads touting that the Class Vehicles both new and used were reliable, endurable, of good finish, of high fit, of professional grade, and

exceptional quality.   Shrum relied on Defendant's representations in making her purchase.

46.     Shrum's Class Vehicle is garaged 100% of the time since purchase and it has never been involved in any wreck nor had any repainting done.   It has the original factory paint.

47.     Shrum purchased her Class Vehicle for her personal, family, and household use.

48.     Her Class Vehicle was not exposed to any unexpected airborne or environmental influences which would have adversely affected its paint.

49.     In late 2019, Shrum noticed what appeared to be discoloration, microblistering, and delamination of the clear coat on her Class Vehicle.   She presented her Class Vehicle to Gordon Chevrolet of Orange Park, Florida for an assessment.

50.     On November 14, 2019, Gordon Chevrolet, an authorized Chevrolet dealership, provided an estimate to repair the hood only (despite there being other body panels with issues) for $1,543.00.   Gordon acknowledged the defect in the paint, indicating that it needed to "strip bad paint" in order to repair the vehicle.

51.     Defendant refused to repair or replace the paint of her Class Vehicle at Defendant's cost and Defendant denied Shrum's warranty claim. In late November

2019, Shrum again contacted Defendant and demanded that it repair and/or replace her defective paint.  Defendant, through its employee "Keith L." refused:



52.     The paint on her Class Vehicle continues to worsen and looks like this today:





53.     Today, to repair and repaint Shrum's Class Vehicle, she would have to pay more than $10,000.  Repainting the car would require sanding the vehicle to the metal and would substantially depreciate the value of the vehicle.  There is no short cut – the Class Vehicles must be sanded and repainted.

54.     The same defective paint and clearcoat was applied to all Class Vehicles.

55.     Ultimately, Defendant has refused to repair or replace Shrum's vehicle, despite acknowledging the common defect.

56.     Shrum expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the paint on her Class Vehicle was defective. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

57.     Shrum would purchase another vehicle of Defendant if Defendant is ordered to correct its paint defects and to ensure future defects are not concealed.

### C. **Ambrose's Facts**

58.     In March 2014, Ambrose purchased a new Black 2015 GMC Yukon XL VIN: 1GKS1HKC2FR114764 at Carl Black GMC in Orlando, Florida, an authorized GMC dealership.

59.     At the time Ambrose purchased his vehicle, it was new and came with a standard GMC three year 36,000-mile new vehicle bumper to bumper express limited warranty.

60.     The warranty Amrbrose received is the same as the one each Class Member received, whether they purchased their vehicle directly through Defendant or through a subsequent used-car retailer.

61.     One of the main and important reasons for Ambrose selecting his Class Vehicle was the paint, which Defendant touted extensively as superior, of professional grade, and containing a clear coat which protected the vehicle.

62.     Prior to his purchase, and primarily in mid-March 2014, Ambrose saw newspaper, magazine, internet, and television ads touting that the Class Vehicles both new and used were reliable, endurable, of good finish, of high fit, of professional grade, and exceptional quality. Ambrose relied on Defendant's representations in making his purchase.

63.     The last advertisement Ambrose recalls seeing prior to purchase was in conjunction with a PGA event in Orlando Florida in mid-March 2014. Defendant promoters utilized the GMC Yukons to ferry PGA players.  These promoters represented to Ambrose and the public that the Yukons' quality, reliability, professional grade, history, and prestige were top notch and of the highest and finest quality.

64.     Defendant utilized PGA player spokespersons to state to Ambrose and the public how impressed they were with the quality of the Yukon, implying that these PGA players who owned Porsches, Mercedes, and Ferraris compared the Yukon's quality to those high end vehicles and that the Yukon was the top of the line.

65.     Ambrose also recalls GMC advertisements that the new Yukon was "more everything" than the prior models, meaning that it was more reliable, more high quality, and more luxurious.

66.     In 2017, and while his Class Vehicle was still under its new vehicle bumper to bumper express limited warranty, Ambrose began noticing issues with the paint on his Class Vehicle.  Specifically, his paint was microblistering and developing a haze underneath the clear coat and the clear coat appeared to be deteriorating.  However, his GMC dealership did not document his concerns at that time.

67.     In September of 2018, Ambrose took his Yukon for service and after a detail by the authorized GMC dealership to try and fix the paint issues, the clear coat delamination and deterioration were still apparent.  The body shop manager at Carl Black Orlando informed Ambrose that the paint problems he was experiencing were common to all Yukon's.

68.     His Class Vehicle was not exposed to any unexpected airborne or environmental influences which would have adversely affected its paint.

69.     Ambrose purchased his Class Vehicle for his personal, family, and household use.

70.     Ambrose further notified Carl Black GMC in Orlando, Florida, an authorized GMC dealership, of the paint issues, but received a response stating that Defendant had refused to repair and/or replace the paint at Defendant's cost and under warranty.

71.     Ambrose was unsatisfied with the denial of warranty.  Defendant was again notified of Ambrose's warranty claim and Defendant again declined to repair and/or replace the defective paint at its cost.  Instead, Defendant offered to cover only "33% of the total repair" which required Ambrose to pay $1,1170.62 to repair the paint only on the hood and roof rails.

72.     Ultimately, after much hassle, Ambrose's dealership paid the $1,1170.62 to repair the paint on the hood and roof rails, but Defendant has refused to provide any compensation or repair and/or replace the remaining defective paint which       is       apparent       in       the       following       pictures:







73.     While Defendant agreed to repaint the hood and roof rails of Ambrose's

Class Vehicle, the remedy is insufficient for at least the following reasons: 1) the

new paint is only on two sections of the car and not the entire car 2) repainting a car

substantially decreases its value, 3) the repainting is done by hand and not by robots

in a sterile environment at the factory thus preventing the same finish originally

promised, 4) the bumpers are not repainted to match which leaves their color

different from the repainted metal, 5) the repair process took about one month to

complete, 6) Ambrose was substantially inconvenienced, and 7) Ambrose will be

unable to resell his Class Vehicle at fair market value as it will be branded forever as "repainted."

74.     The same defective paint and clearcoat was applied to all Class Vehicles.

75.     Ambrose expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the paint on his Class Vehicle was defective. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

76.     Ambrose would purchase another vehicle of Defendant if Defendant is ordered to correct its paint defects and to ensure future defects are not concealed.

**D. Kilburn's Facts**

77.     In 2017, Kilburn purchased a 2015 GMC Yukon SLT from Dossett Big 4, in Tupelo, MS, Vehicle Identification No. 1GKS1HXC5FR192861.

78.     At the time Kilburn purchased her vehicle, it was used and came with a standard GMC three year 36,000-mile new vehicle bumper to bumper express limited warranty.

79.     One of the main and important reasons for Kilburn selecting her Class Vehicle was the paint, which Defendant touted extensively to her as superior, of professional grade, and containing a clear coat which protected his vehicle.

80.     Prior to her purchase, and mainly in early to early-2017, Kilburn saw Defendant's newspaper, magazine, social media, and television ads touting that the Class Vehicles both new and used were reliable, endurable, of good finish, of high fit, of professional grade, and exceptional quality.  Kilburn relied on Defendant's representations in making her purchase.

81.     The warranty Kilburn received is the same as the one each Class Member received, whether they purchased their vehicle directly through Defendant or through a subsequent used-car retailer.

82.     Kilburn's Class Vehicle had not been wrecked nor had it been repainted – it has the original paint from Defendant's factory.

83.     Kilburn purchased her Class Vehicle for her personal, family, and household use.

84.     Her Class Vehicle was not exposed to any airborne or environmental influences which would have adversely affected its paint.

85.     Kilburn expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the paint on her Class Vehicle was defective.  Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

86.     Kilburn first experienced problems with the paint on her Class Vehicle in 2021.

87.     The paint and clear coat condition continued to deteriorate and in April 2021, when it was obvious that there was a systemic problem with her paint, Kilburn took her Class Vehicle to a local body shop and received an estimate of $2,500 to repair just the hood and the roof.  Her Class Vehicle needed more than just a repaint of the hood and the roof.

88.     Today, to repair and repaint Kilburn's Class Vehicle, she would have to pay more than $10,000.  Repainting the car would require sanding the vehicle to the metal and would substantially depreciate the value of the vehicle.  There is no short cut – the Class Vehicles must be sanded and repainted.

89.     In February 2022, Kilburn demanded that Defendant repair and/or replace her Class Vehicle but Defendant refused.

90.     The same defective paint and clearcoat was applied to all Class Vehicles.

91.     Ultimately, Defendant has refused to repair or replace Kilburn's vehicle, despite acknowledging the common defect.

92.     Although it is difficult to see the extent of the defect via pictures, the following pictures show Kilburn's paint today and the obvious defects:









93.     Kilburn's vehicle is just one of thousands of Class Vehicles that suffer from an irreparable defect in the exterior paint that results in peeling, flaking, bubbling, erosion, and microblistering of the clearcoat.

94.     Kilburn expected her Class Vehicle to be of good and merchantable quality and not defective. She had no reason to know, or expect, that the paint on her Class Vehicle was defective. Had she known these facts, she would not have bought her Class Vehicle or would have paid less for it.

E.  **General Facts**

95.     Plaintiffs and the putative class sought out the Class Vehicles and purchased the Class Vehicles intentionally after seeing and relying on Defendant's promises, warranties, and advertisements.   Each Class Vehicle is a luxury vehicle that comes with a high price tag, and the price is indicative of a vehicle that is superior to others in looks, drivability, fit, and finish.

96.     The condition of the exterior paint on Class Vehicles is an important aspect of their overall value, is considered by first purchasers as well as secondary purchasers, and it often determines whether a car will sell at fair market value or not.

97.     The defects in the Class Vehicles' paint have affected the resale and value of the Class Vehicles.  Defendant recognizes this as it advertises the quality of its paint and offers lower values for cars with paint problems such as those on the Class Vehicles. This is proven by the fact that Defendant seriously discounts its offers for any buybacks or secondary purchases of Class Vehicles.

98.     The defects in the Class Vehicles' paint stem from one of three sources: 1) a defect in the paint itself, 2) a defect in the clear coat, or 3) a defect in the application of the paint and/or clearcoat.  Any or all of these defects will cause the paint and clear coat to microblister, delaminate, peel, fade, and bubble.

99.     Defendant knew, or should have known, that prior to marketing and selling the Class Vehicles to Plaintiffs and the putative class that the clear coat which

is supposed to protect the paint and the Class Vehicle's body, was defective and/or was defectively applied.  The paint and the clear coat were chemically unable to appropriately bond or one or both products were defective, thereby causing the above-described issues.

100.    Notwithstanding this long-standing problem and extensive knowledge of the issues prior to Plaintiffs' purchases, Defendant continued to advertise and sell the Class Vehicles and failed to issue an appropriate recall. It knowingly failed to provide truthful information about the defects of the paint.

101.    The defects in the paint that Plaintiffs and the putative class are experiencing are not the "Chemical Paint Spotting" noted in Defendant's warranty booklets.  This is because the defect does not manifest itself as "blotchy, ring-shaped discolorations, and/or small irregular dark spots etched into the paint surface."

102.    Defendant benefitted from Plaintiffs' and the putative class' purchases of the Class Vehicles.  For those Plaintiffs and putative class members who purchased new vehicles, Defendant received revenue from the sale.

103.    For those Plaintiffs and putative class members who purchased used vehicles, Defendant received a benefit because the purchases increased the used market prices, thereby allowing Defendant to charge more for its new vehicles.

104.    For each Class Vehicle, Defendant issued an express warranty which covered the vehicle, including but not limited to, the exterior paint, warranting it to be free of defects in materials and workmanship at the time of purchase or lease.

105.    This warranty was a material factor in Plaintiffs' decisions to purchase Class Vehicles.

106.    Pursuant to its express warranties, Defendant warranted the Class Vehicles, including the exterior surfaces, to be free of defects in design, materials, and workmanship, and warranted that repairs or replacements necessary to correct defects in material or workmanship arising during the first 36 months or 36,000 miles, whichever came first, would be made by authorized dealers, without charge.

107.    Defendant breached its warranties for the Class Vehicles as a result of the latent defect with the paint. Despite acknowledging the defect, Defendant breached its warranties by failing to repair the paint as warranted, and otherwise continuing to use the defective paint on its Class Vehicles.

108.    In breach of Defendant's warranties, the Class Vehicles are defective, unfit for the ordinary purposes for which they are intended to be used, and not merchantable.

**<u>Defendant's Marketing and Concealment</u>**

109.    Defendant knowingly manufactured and sold the Class Vehicles with the paint defect, while willfully concealing the true inferior quality and sub-standard performance of the Class Vehicles' exterior paint.

110.    Defendant directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the internet, billboards, print publications, mailings, and through other mass media, including to Plaintiffs.

111.    Defendant's marketing material describes the various Class Vehicles as "the best SUV," "awesome," "luxurious," "professional grade," and "the one that performs." Defendant's slogan for its Class Vehicles was "the new premium."

112.    Defendant itself has recognized the importance of the quality of paint used on its Class Vehicles.  Defendant specifically identifies paint as being a covered warranty item in its warranty booklet and acknowledges that defects are "normally corrected during the new vehicle preparation."

113.    Here, for the Class Vehicles, the paint defect was not corrected during the new vehicle preparation.

114.    Although Defendant knew of the clear coat's propensity to peel, blister, flake, delaminate, and bubble on Class Vehicles, it failed to notify Plaintiffs and Class Members of this prior to their purchase.

115.    When Plaintiffs purchased their vehicles, they relied upon representations of Defendant that the cars had been inspected and any paint defects were "taken care of" prior to placing the vehicles on the market.

116.    As a result, each Plaintiff expected that the paint and application process used on the Class Vehicles would not cause its clearcoat to peel, flake, delaminate, or bubble under normal conditions, and cause other problems that would negatively impact the value of the Class Vehicles.

117.    Plaintiffs and the putative class were exposed to Defendant's pervasive, long-term, national, multimedia marketing campaign touting the supposed quality and durability of the Class Vehicles and their component parts, including paint, and they justifiably made their decisions to purchase their Class Vehicles based on Defendant's misleading marketing that concealed the true, defective nature of the paint used on the Class Vehicles.

118.    Plaintiffs and Class, in deciding to purchase the Class Vehicles, relied upon Defendant to inform the public and potential purchasers of any defects in the Class Vehicles, including defects in the paint.

119.    Defendant failed to inform Plaintiffs and Class of the defect with the paint, and Plaintiffs and Class would not have purchased the vehicles had they known of the defects in the paint, or they would have paid a much lower price for the vehicles had they known of the defect.

A.      **Defendant Knew of the Paint Defect Prior to Sale or Lease of the Class Vehicles.**

120.    Defendant was aware of irreparable defects with the paint and clear coat used on Class Vehicles.  Defendant was aware of these defects at the time it advertised and sold the Class Vehicles and thereafter when it continued to disseminate information about the vehicles for those Plaintiffs and putative class members who purchased their Class Vehicles on the secondary market.

121.    At those times, the defects with the paint and clearcoat that Defendant knew about, or should have known about, included -- but were not limited to -- defects in the manufacture, process, materials, and workmanship of the vehicle. Defendant failed to inform Plaintiffs and the putative class about the defects, and the defects have rendered the vehicle unmerchantable.

122.    Prior to a new paint and/or paint system being used on a vehicle, automakers such as Defendant are known to employ multiple standards and test protocols to ensure long life and film integrity of the paint system as well as the underlying substrate. In addition to extensive exterior and accelerated weathering evaluation of clearcoats, there is additional aggressive testing prior to the qualification of an automotive coating system to ensure the paint system will provide long lasting protection when exposed to environmental elements. These tests often

run over the course of two-to-five years before a vehicle using the paint system is brought to market.

123.    Most of these test procedures are developed and standardized by the American Society for Testing and Materials ("ASTM") and the Society of Automotive Engineers ("SAE"), and typically include:

   a. accelerated weathering tests to assess paint color, gloss retention, and appearance in general, such as Xenon Arc (subjecting test panels to intense radiation), QUV (subjecting test panels to high ultra-violet light and condensing humidity cycles), EMMAQUA (placing test panels on racks that rotate with the sun to provide maximum UV light exposure), and humidity tests (subjecting test panels to 100% relative humidity at 100°F for several weeks);

   b. long-term outdoor weathering tests, where test panels are placed on so called "test fences" at 45-degrees facing south (according to ASTM standards) in various environments, such as Florida (high UV light, humidity, and salt spray), Arizona (intense UV light and temperature), and industrial sites (high pollutants such as acid rain and various chemicals);

   c. corrosion resistance tests, including salt spray (subjecting test panels to 5 wt. salt spray at 95°F for several weeks), cyclic corrosion (subjecting test panels to various cycles of salt spray, humidity, wet/dry, temperature),

condensing humidity (subjecting test panels to temperature cycling in highly saturated air, CASS (subjecting test panels to salt spray with added acetic acid for accelerated testing), and Kesternich (subjecting test panels to acid rain simulation);

d. physical and mechanical tests, including flexibility, impact resistance, abrasion resistance, scratch and mar resistance, coating thickness, adhesion, and hot and cold cycling; and

e. chemical properties testing, including resistance to solvents, chemicals, and various fluids the vehicle will likely encounter in the open environment.

124.    In addition, Defendant did or should have performed several of the above-described ASTM and SAE test procedures.

125.    Defendant has developed and publicized what is referred to as "GM SAE Standards & Testing" that are used in connection with the testing of its vehicles, including GM 4350M for a test relating to the "Painted Part Performance Requirement," GM 9200P "Accelerated Aging and Steaming," GM 9505P "Automotive Environmental Cycles," GM 9540P "Accelerated Corrosion Test," GMW 14669 "Organic Coating/Finish Performance for Exterior and Interior Metallic Materials," as well as various other tests relating to the performance of the paint used on its vehicles, including the Class Vehicles, in simulated real-world

conditions.   Applied Technical Services, GM SAE Standards & Testing, https://atslab.com/wp-content/uploads/2019/03/GM-SAE-Automotive-Spec-Combined.pdf (last visited February 11, 2022).

126.   The development of the paint and the paint system, including the testing performed in connection therewith, would have revealed the paint defect. The details regarding the testing performed by Defendant and the results of that testing are in the exclusive custody and control of Defendant.

127.   If Defendants conducted the proper standard testing, the defects would have become apparent to Defendant because these tests are designed to accelerate the normal aging process of vehicles such that during these tests Defendants would have discovered in a short period of time that the paint was defective.

128.   If Defendant actually conducted these standard tests, Defendant would have been put on notice of the defect and because it did not disclose the defect to Plaintiffs and the putative class it must have actively concealed it.

129.   If Defendant did not conduct these standard tests, it did so knowing that it was against its own procedures and industry standards.

130.   On information and belief, prior to the manufacture and sale of the Class Vehicles, Defendant knew of the paint defect through, or as evidenced by, sources such as pre-release design and testing information; technical service bulletins; service center data; early consumer complaints made directly to

38

Defendant, collected by NHTSA ODI, and/or posted on public online vehicle owner forums; testing done, including testing in response to consumer complaints; aggregate data from Defendant's dealers; and other internal sources unavailable to Plaintiffs and Class without discovery.

131.    Defendant monitors public online vehicle owner forums and responds to putative class member complaints and at least for www.chevroletforum.com, they have done so since at least 2010 and in approximately four years from 2010 to 2014, Defendant made 4,167 posts!  Their last activity on www.chevroletforum.com was April 14, 2021.    https://chevroletforum.com/forum/tahoe-suburban-diy-useful-threads-61/paint-peeling-off-2012-suburban-gm-said-not-under-warranty-60366/

132.    Defendant also monitors YouTube videos, like the one below, and posts information      on      YouTube      since      at      least      2006. https://www.youtube.com/c/Chevrolet/about



## Chevrolet ✓

702K subscribers

**SUBSCRIBE**

‹    PLAYLISTS        COMMUNITY        CHANNELS        **ABOUT**        ›

### Description

Welcome to the official Chevrolet YouTube channel. Here you can take a closer look at how this iconic automotive brand sets innovation in motion through compelling design and revolutionary technology. Explore the versatility of our Family of SUVs, the thrilling performance of the mid-engine Corvette, the power of the new, All-Electric Bolt EUV and the capabilities of the strongest, most advanced Silverado. Grab the wheel and discover the possibilities that lie ahead as we Find New Roads together.

More information about the Chevrolet brand and models can be found at www.chevrolet.com.

For information on GM's privacy policy please visit the "GM Privacy Statement" linked below.

### Details

Location:        United States

### Stats

Joined Jan 11, 2006

56,172,955 views







**B.** **Defendant Knew that Paint Defects Were Prevalent in Their Vehicles as Early as xxxx**

133.     Defendant also knew or should have known about the potential for paint defects based upon complaints made on the prior version of the Chevrolet Suburban:

a. 9/2/2013: "Paint peeling off of 2012 Suburban and GM said not under warranty: Purchased a new 2012 Suburban off of the dealers lot this past February while we were in Florida… I now have about 5200 miles on it. It is garage kept here in IL… Paint just peeled off the plastic panel in a 3" diameter circle. I saved the pieces to show my Chevy dealer here in IL… we ran our hands over the paint and it has a ripple in it… I was told it was not warranty work. But they would not put that in the computer and print it our for me. I called GM Care at least 15 times before they returned my call."     https://chevroletforum.com/forum/tahoe-suburban-diy-useful-threads-61/paint-peeling-off-2012-suburban-gm-said-not-under-warranty-60366/

b. 9/4/2013: "GMC paint problem: GM has had a problem with the hood and roof paint flaking for years. I thought I would publish this video to demonstrate how poor the response is from GM to fix problems. The instrument panels in the Yukon, the Silverado and many others is another demonstration of the pathetic service  that GM delivers.  They purposely wait for the average consumer to drive past the mileage cap before they offer a recall or a solution to the problem they have known about for some

42

time. This is the way that you repay the taxpayers who bailed you out? Shame on you GM! You are an embarrassment to American made products!"          https://www.youtube.com/watch?v=HdFuzNyXwt8



**C.**    **Defendant Issued at Least One Service Bulletin Related to Defective Paint for the 2014 Chevrolet Silverado and GMC Sierra no Later Than August 2014**

134.    Defendant does not publicly share its "Service Bulletin's" and takes great lengths to prevent them from leaking to the public.  However, at times, Defendant's Service Bulletin's are leaked.

135.    Plaintiffs were able to locate a Service Bulletin dated August 2014 which shows that Defendant was aware of defective paint on the 2014 Chevrolet Silverado and GMC Sierra no later than August 2014.



**Service Bulletin**

Bulletin No.: PIT5313
Date: Aug-2014

## PRELIMINARY INFORMATION

**Subject:**     Paint Peeling Above Anti-Chip Area

**Models:**     2014 Chevrolet Silverado 1500
               2014 GMC Sierra 1500
               Built at Ft. Wayne Assembly (11th VIN Position = Z)
               Built Prior to 5/15/2014

The following diagnosis might be helpful if the vehicle exhibits the symptom(s) described in this PI.

**Condition/Concern**

Some owners may comment of the paint peeling above the Anti-chip area, as shown below:



GM Engineering has made changes to their process to correct this concern at the assembly plant effective 5/15/2014.

**Recommendation/Instructions**

Refinish the affected areas using the appropriate material supplied by the refinish material supplier being used by the repair facility for finish repairs

**Note:**  All paint finish repairs of rigid exterior surfaces must meet GM standards. Refer to the latest revision of the GM Approved Refinish Materials book to identify the paint systems you may use that have been engineered to meet GM standards. The GM Approved Refinish Materials book supplies all approved products, including volatile organic compound (VOC) compliant regulations recommended by the individual manufacturer, and detailed procedures for materials used in their paint system.

The latest revision of the GM Approved Refinish Materials booklet is located on the Genuine GM Parts website at www.genuinegmparts.com. In Canada, the GM Approved Refinish Materials Booklet is also available in GM GlobalConnect by choosing LIBRARY, SERVICE and then PAINT SHOP.

**Warranty Information**

For vehicles repaired under warranty, please refer to the latest version of bulletin 11-00-89-007 for warranty information on Exterior Labor Operations.

**D.     Defendant Knew of the Paint Defect from Class Member Complaints Made Directly to Defendant as Well As Posted Online**

136.     Defendant also knew or should have known about the paint defect based on complaints made directly to Defendant. The large number of complaints, and the consistency of their descriptions of peeling, blistering, flaking, delaminating, and bubbling caused by the defective paint and/or clear coat, alerted or should have alerted Defendant to this substantial defect affecting a wide range of its vehicles.

137.     Information as to the full extent of complaints made directly to Defendant about the defective paint is information presently in the exclusive custody and control of Defendant and is not yet available to Plaintiffs prior to discovery.

138.     However, many Class Vehicle owners complained directly to Defendant and Defendant's authorized dealerships about the paint issues they experienced. The number and consistency of these complaints should have alerted Defendant to the existence of the paint defect and some of these are reproduced below:

- 8/19/2015: "2014 Silverado – Silver Paint Peeling: Is anyone experiencing the silver paint peeling on their truck? Our truck is exactly 1 year old and the paint started peeling on the driver side door. We brought it in to the dealer and they told us it appears the paint didn't adhere to the primer. They repainted the door at no cost to us because they said it was under warranty. We got the truck back and have had it exactly 2 weeks and the paint is now peeling on the passenger side door."
- 11/2015 "2014 Silverado/Sierra watch for paint peeling off doors: This also applies to the 2014 GMC Sierra - so if you know anyone who has one - advise

them as well. Chevrolet/GM are keeping this quiet to limit repairing a lot of trucks. It is difficult to notice and even the Rep had a hard time finding it (when he knew about my warranty claim and supposedly has researched the history - aka, there's a picture in the Service Bulletin). Our 2014 Silverado was roughly 16 months old with 10,000 miles when we first noticed a chunk of paint missing from the bottom of the passenger door (roughly the size of a nickel or dime). At first I thought something had hit it to chip the paint off but close inspection showed all the primer was perfectly intact and there was no door ding or dent in the area."

- 10/20/2020: "2015 Chevrolet Tahoe: ~tl- the contact owns a 2015 Chevrolet Tahoe. The contact stated that the paint on the engine hood is peeling off. The vehicle was taken to local dealer camino real Chevrolet (2401 s atlantic blvd, monterey park, CA 91754 (323) 264-3050) where it was not diagnosed. The manufacturer had not been informed of failure. The failure mileage was approximately                          69,000.                          Dl."
  https://www.carproblemzoo.com/chevrolet/tahoe/paint-problems.php

- 5/1/2020: "2016 Chevrolet Tahoe: I have a 2016 Tahoe that I purchased new from dealer. I had also purchased a protection plan with finishing touch that they talked us into when we bought the car on the paint and interior. 3. 5 years into ownership the paint on the hood and roof faded. We contacted the protection plan and they were more than willing to take care of. They sent an adjuster out and he classified as clear coat failure. Then the run around started. I contacted Chevrolet and I contacted the dealership. We took the car to the dealership and talked with the assistant manager in the service department. He brought out the manager and he confirmed that it was paint failure. So then the dealership gets involved with Chevrolet. The first call comes back and says they will cover 20%. I told them that some one was going to cover the repairs and it won't be me. They sold me a protection plan through finishing touch for the paint and the interior so someone needs to cover the damage. After a few days I get a call stating that between the dealership, Chevrolet and finishing touch it would be repaired at no cost. � now it gets better. We took the vehicle back to the dealership to have the hood and the roof repainted. After a week at the body shop the car is ready to be picked up. We walk up to the car and it is all shiny and looking good. But the color doesn't match. We

call the service manager out and he says he can't see the issue. The Tahoe is a brownstone metallic and the hood is more bronze than the rest of the vehicle. He tells me he can get the paint manager to come speak to me because he can't see the problem. This is a overcast day so it doesn't show really bright but my husband and I can see the difference. While we are waiting for the manager from the body shop to arrive we walk around the vehicle. Dealership states Chevrolet will not blend the paint to match." https://www.carproblemzoo.com/chevrolet/tahoe/paint-problems.php

- 11/1/2018: "2016 Chevrolet Tahoe: The exterior paint starting fading, clear coat not holding up." https://www.carproblemzoo.com/chevrolet/tahoe/paint-problems.php

- 1/6/2019: "We purchased a certified pre-owned 2015 Suburban at the end of last year. It was shiny and pristine at the dealership. Within two months of having it home, we notice the paint on the hood and roof looked dull and like the paint was swirled. We had it detailed and were advised by the detailer that he felt the paint was defective.   The vehicle had approx 30,000 miles on it when we bought it.  While we didn't expect it to be 100% unblemished, we never expected the paint on the hood and roof to completely fail.  It was disguised with wax apparently when it was on the lot.

  Since then, we have been in touch with the dealership that sold us the vehicle, GM corporate, and our local dealership. The dealership where we purchased the vehicle has told us that they will do nothing to assist us. This was in January of this year, well before the warranty was up, not even two months after we purchased it.   We do not feel this is a warranty issue anyway but rather a defect." https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/

- 9/30/2019: "Our 2015 Suburban is doing the exact same thing, we are getting a run around.  Chevy says it not their problem/fault, our dealer said to go to Chevy.  Chevy corporate online said to go to the local dealer, the polyshield we had put on doesn't cover the paint "cracking".  So we are where you are, what did you do and how did you get it fixed.  We are going to go get estimates at auto shops next week." https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/

- 10/11/2019: "I just emailed the person in the original post about this. My 2015 Yukon is doing the same thing and looks like a 20 year old car. We are getting the same responses from our dealership and GM. We have got to get something done about this! These $70K vehicles should not be doing this!!!!" https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/

- 11/4/2019: "I have the same paint issue on a 2014 Yukon.  Its been like this for some time.  About 18 months ago I have the dealer look at it.  They and GMC declined to do anything about it." https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/

- 8/1/2018" The coups de gras, which was the final straw is when the top coat on the hood and top of Tahoe started to fade/grey and crack on the black undercoat. To fix the top coat, the dealership wanted $2300.00; of which they were going to pick up 10% of after my pushing for warranty. The Tahoe is 3 years old. The paint should last well into a decade, and I kept the car washed weekly and detailed every 6 months. This expense after all the cost for the AC repairs and replacement cost for several external brackets and trim that broke within                    3                    years." https://www.carcomplaints.com/Chevrolet/Tahoe/2015/body_paint/clear_coat_fading_and_cracking.shtml

- 6/12/2018: "I've started to develop more of the Clear Coat Peeling on the rear drivers side of the bed. This time, I'm calling the 800 number and I'm gonna open a support ticket. I'm fearful of the longevity of the paint. I feel like I'm getting screwed. I love my '17 but I hate the cosmetic issues it has been developing. I've got 10k miles left to the 36k miles and I'm not even in the second year owning the truck yet." https://www.gm-trucks.com/forums/topic/212696-peeling-clear-coat/

139.    Further, knowledge of the defect is evidenced by recognition of an issue with the paint by each Defendant employee Plaintiffs spoke with about their vehicle's paint issues when they complained directly to Defendant.

140.    As shown by this small sampling of complaints from forums and websites such as www.carproblemzoo.com, www.carcomplaints.com, www.gm-trucks.com, and www.tahoeyukonforum.com, consumers have been vocal in complaining about the paint defect and the damage it has caused.  A multi-billion dollar vehicle design and manufacturing company such as Defendant undoubtedly tracks and has tracked such sites and was aware or should reasonably have been aware of the paint defect in the Class Vehicles.

141.    In sum, Defendant has actively concealed the existence and nature of the paint defects from Plaintiffs and the putative class since at least 2014 (and certainly before the date that Plaintiffs purchased their Class Vehicles) despite its knowledge of the existence and pervasiveness of the paint defect, and certainly well before Plaintiffs and the putative class purchased their Class Vehicles.

142.    Specifically, Defendant has:

a.  failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the paint defect;

b.  failed to disclose, at and after the time of purchase, lease, and/or service, that the paint and paint process used on the Class Vehicles were defective and not fit for their intended purposes;

c. failed to disclose, and actively concealed, the fact that the paint and/or the paint process used on the Class Vehicles were defective, despite the fact that Defendant learned of the paint defect as early as 2014, and likely even earlier;

d. failed to disclose, and actively concealed, the existence and pervasiveness of the paint defect even when directly asked about it by Class members during communications with Defendant, Defendant Customer Assistance, Defendant's authorized dealerships, and Defendant's authorized service centers;

e. actively concealed the paint defect by forcing Class members to bear the cost of repainting, while at the same time performing those services at no (or lower) cost for those who complained vocally and often;

f. actively concealed the paint defect by inadequately repainting the Class Vehicles, so that the paint defect has never been permanently corrected in the Class Vehicles, even though Plaintiffs and the putative class were led to believe that the services would cure, and, in fact, had cured the paint defect in their Class Vehicles;

g. actively concealed the paint defect by knowingly repainting the Class Vehicles with the same paint, clear coat, and paint process, while knowing and concealing that repainting the Class Vehicles would not prevent and/or

cure the problems associated with the paint defect because the paint used on the Class Vehicles remained defectively designed; and

h. actively concealed the paint defect by knowingly repainting the Class Vehicles with defective paint using the same paint process, while knowing and concealing that repainting the Vehicles would not prevent and/or cure the problems associated with the paint defect because the process by which the paint was applied to the Class Vehicles remained defective.

**E.   Defendant Knew of the Paint Defect from Repair Data.**

143.   Defendant also knew or should have known about the paint defect because of the large number of repainting and repair jobs it performed on Class Vehicles due to peeling, blistering, delaminating, and bubbling.

144.   For instance, in the Fall of 2018, Defendant acknowledged that the paint defect with Ambrose's Class Vehicle's was "common to all Yukons."

145.   Defendant collects, reviews, and analyzes detailed information about repairs made on vehicles at its dealerships and service centers, including the type and frequency of such repairs.  This information is known to exist in databases held by Defendants. Complete data on such repairs is exclusively within Defendant's control and unavailable to Plaintiffs prior to discovery.

## INADEQUATE REMEDY

146.     As evidenced by the experiences of Plaintiffs and the estimates they have received after their Class Vehicles experienced the paint defects, repainting the Class Vehicles (when and if Defendant agrees to do so), even if done properly, does not cure the paint defect and does not remedy the diminution of value that occurs as a result of the repainting.

147.     For all the Class Vehicles, the factory paint was supposed to be applied by robots to exacting tolerances consistently over all body panels—a point highlighted by Defendant when marketing the Class Vehicles to customers— whereas Defendant's repair process is haphazard at best and results in paint inconsistencies relative to appearance and longevity.

148.     Indeed, the repainting of a Class Vehicle at numerous local repair shops could never achieve the same finish that is produced during the original painting of it given the equipment and methods used by Defendant in the paint system that is applied to the pristine body of a Class Vehicle, not to mention the pristine and strictly controlled environment in which the paint system is applied.

149.     The environment in which the Class Vehicles are repaired, and the limitations of body shops, including those who are certified by Defendant, that all but assures that the quality of re-painting can never be as good as the original paint job. Defendant knew that the repair procedures were inadequate at the time they

were first implemented, especially in light of the environmental and technical limitations of the body shops it authorized to perform such repairs, yet concealed that fact from Plaintiffs and the putative class.

150.    Even if the Class Vehicles were properly repainted, their values would still be diminished, as repainted newer vehicles are worth less than vehicles with original paint. Indeed, there is a stigma associated with a repainted vehicle, especially from a luxury brand like Defendant, and the fact that a vehicle has been repainted is often used by a potential buyer as a bargaining chip to lower the price.

151.    In addition, anticipated car purchasers often shy away from a vehicle that has been repainted, as it rings alarm bells that the vehicle may have been damaged in an accident and repainted as a result. A non-original paint job could also be an indication of major body repairs to the Class Vehicle that are being hidden, not to mention rust.

152.    According to an online poll conducted by CarMax, 72% of respondents said that repainting the car is the strongest indicator of vehicle damage. In fact, CarMax states that repainting is one of the biggest warning signs indicating a vehicle may have been in a major accident, and instructs consumers to do the following in order to determine whether a used car may have been in a serious accident:

> Look for signs of repainting on the car, such as inconsistency in the paintwork or paint on the molding or gaskets. Run your finger along the inside of the door edge and see if the finish is smooth or rough. A rough finish can be caused by overspray during repainting. If signs of repainting are found, ask

additional questions to determine if the paintwork was for minor scratches and dents or to cover up more serious vehicle damage.

153.     Paint work to a vehicle typically shows up on a CARFAX Vehicle History Report, as such repairs are often reported by the dealerships or body shops performing them. Even if it is not, paint work can easily be identified through the use of a paint meter, which are used by dealers when evaluating vehicles for trade-in purposes. In the case of the Class Vehicles, given the nature of the paint defect and the inadequate repainting of the Class Vehicles, the paint work can be identified by potential buyers with the naked eye and without the use of a paint meter.

154.     Kelley Blue Book ("KBB") similarly bases its appraisals on the condition of the vehicle. KBB divides the condition of used vehicles into the following four grades:

> **Excellent** condition means that the *vehicle looks new*, is in excellent mechanical condition and needs no reconditioning. ***This vehicle has never had any paint or body work*** and is free of rust. The vehicle has a clean Title History and will pass a smog and safety inspection. The engine compartment is clean, with no fluid leaks and is free of any wear or visible defects. The vehicle also has complete and verifiable service records. Less than 5 percent of all used vehicles fall into this category.

> **Good** condition means that the vehicle is ***free of any major defects***. This vehicle has a clean Title History, the paint, ***body and interior have only minor (if any) blemishes***, and there are no major mechanical problems. There should be little or no rust on this vehicle. The tires match and have substantial tread wear left. A "good" vehicle will need some reconditioning to be sold at retail. Most consumer owned vehicles fall into this category.

**Fair** condition means that the ***vehicle has some*** mechanical or ***cosmetic defects*** and needs servicing but is still in reasonable running condition. This vehicle has a clean Title History, ***the paint, body*** and/or interior ***need work performed by a professional***. The tires may need to be replaced. There may be some repairable rust damage.

**Poor** condition means that the ***vehicle has severe*** mechanical and/or ***cosmetic defects*** and is in poor running condition. The vehicle may have problems that cannot be readily fixed such as a damaged frame or a rusted-through body. A vehicle with a branded title (salvage, flood, etc.) or unsubstantiated mileage is considered "poor." A vehicle in poor condition may require an independent appraisal to determine its value.

155.    According to KBB's online Condition Quiz, vehicles that have extensive paintwork and no paint damage are considered to be, at most, in "Good" condition, while vehicles that have no paintwork and extensive paint damage are considered to be, at most, in "Fair" condition.

## PLAINTIFFS WERE DAMAGED BY THE PAINT DEFECT

156.    Plaintiffs and the putative class purchased or leased the Class Vehicles based on their reasonable but mistaken belief that their Class Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by Defendant were not those for which Plaintiffs and the putative class bargained. Rather, the Class Vehicles suffered from a common defect – the paint defect. Had Plaintiffs and the putative class known of the paint defect, they would have either: (a) paid substantially less for the Class Vehicles; (b) required an immediate remedy

that restored the Class Vehicles to the conditions bargained for; or (c) not purchased or leased the Class Vehicles.

157.    As a result of the disparity between the quality of the Class Vehicles negotiated for and the Class Vehicles actually received, Plaintiffs and the putative class suffered economic harm.

158.    This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that remedy); (b) the discount that Plaintiffs and the putative class would have required to accept the Class Vehicles in their actual condition; and/or (c) the diminished value of the Class Vehicles, both those that have been repainted and those that have not.

159.    Plaintiffs and the putative class paid premiums to purchase and lease the Class Vehicles as a result of the brand, quality, durability, and value representations made by Defendant. A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Paint Defect. Plaintiffs and the putative class were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for – a high-quality and durable vehicle that would retain its value under normal conditions.

160.     As a direct result of Defendant's misrepresentations and omissions, Plaintiffs and the putative class overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiffs and the putative class paid a premium for the Class Vehicles, which Defendant advertised as being durable and of high-quality, and received Class Vehicles that contained a known but concealed defect. Defendant was unjustly enriched because it obtained and retained monies paid by Plaintiffs and the putative class who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

161.     In addition, the widespread disclosure of the paint defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiffs and the putative class have suffered a direct pecuniary loss in the form of the decreased value of their Class Vehicles, even when the Paint Defect has not yet manifested.

162.     As a result of Defendant's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose the Paint Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

163.     Plaintiffs and the other Class members were injured as a result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value, whether they are re-painted or not.

These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

## FRAUDULENT CONCEALMENT FACTS DETAILED

164.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Defendant responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles. Defendant necessarily is in possession of, or has access to, all of this information.  Plaintiffs are, however, able to provide sufficient specificity on the concealment, as set forth herein.

165.    Defendant owed a duty to Plaintiffs and the putative class to disclose to them what was known about the paint defects as soon as they were known. Defendant knew that Plaintiffs and the putative class chose Defendant's brand intentionally and for the purpose of displaying their luxury vehicles.  Because of the particular nature of Plaintiffs and the putative class who affirmatively chose Defendant's brand, Defendant were on notice that the Plaintiffs and the putative class expected certain qualities from the paint.

166.    Plaintiffs' claims arise out of Defendant's fraudulent active and willful concealment of the paint defect and the peeling, flaking, delamination, and bubbling of the Class Vehicles' paint it causes, and its representations about the quality,

durability, and value of the Class Vehicles, including the paint used on the Class
Vehicles.

167.     To the extent that Plaintiffs' claims arise from Defendant's fraudulent
concealment, there is not one document or communication, and not one interaction,
upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times,
including specifically at the time they purchased their Class Vehicles, Defendant
knew, or was reckless in not knowing, of the paint defect; Defendant was under a
duty to disclose the paint defect based upon its exclusive knowledge of it, its
affirmative representations about it, and its concealment of it, and Defendant never
disclosed the paint defect to Plaintiffs or the public at any time or place or in any
manner.

168.     Plaintiffs make the following specific fraud allegations with as much
specificity as possible although they do not have access to information necessarily
available only to Defendant:

   a. ***Who***: Defendant actively concealed the paint defect from Plaintiffs and the
      putative class while simultaneously touting the quality and durability of the
      Class  Vehicles, as alleged, *supra*. Plaintiffs are unaware of, and therefore
      unable to identify, the true names and identities of those specific individuals
      at Defendant responsible for such decisions but upon information and belief

understand them to be employees within the sales and marketing division of Defendant.

b. *What*: Defendant knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the paint defect, as alleged, *supra*. Defendant concealed the paint defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles, as alleged, *supra*.

c. *When*: Defendant actively and willfully concealed material information regarding the paint defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than 2014, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day, as alleged, *supra*. Defendant has not disclosed the truth about the paint defect in the Class Vehicles to anyone outside of Defendant. Defendant has never taken any action to inform consumers, and has actively and willfully concealed, about the true nature of the paint defect in Class Vehicles. And when consumers brought their Class Vehicles to Defendant complaining of the clearcoat peeling, flaking, delaminating, or bubbling off of their Class Vehicles, Defendant denied any knowledge of, or responsibility for, the paint defect, and in many instances, actually blamed owners/lessees for causing the problem.

d. **_Where_**: Defendant concealed material information regarding the true nature of the paint defect in every communication it had with Plaintiffs and the putative class and made contrary representations about the quality and durability of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing in which Defendant disclosed the truth about the paint defect in the Class Vehicles to anyone outside of Defendant. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on Defendant's website.

e. **_How_**: Defendant concealed the paint defect from Plaintiffs and the putative class and made representations about the quality and durability of the Class Vehicles. Defendant actively concealed the truth about the existence and nature of the paint defect from Plaintiffs and the putative class at all times, even though it knew about the paint defect and knew that information about the paint defect would be important to a reasonable consumer, and Defendant promised in its marketing materials that the Class Vehicles have qualities that they do not have.

f. **_Why_**: Defendant actively concealed material information about the paint defect in Class Vehicles for the purpose of inducing Plaintiffs and the putative class to purchase or lease Class Vehicles, rather than purchasing or leasing

competitors' vehicles and made representations about the quality and durability of the Class Vehicles. Had Defendant disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

169.    Had Defendant disclosed the paint defects to Plaintiffs and the putative class, they would not have been damaged, as alleged *supra*, as they would not have purchased or leased their Class Vehicles.  Each Plaintiff and the putative class, because of the nature of the Class Vehicles as luxury and special vehicles, would have been in a position, whether via advertising, marketing, research or otherwise to have learned of Defendant's disclosures concerning the paint defects.

170.    Further, had Defendant disclosed the paint defects, the asking price or sticker price of the Class Vehicles would have been considerably less than other colored Defendant cars of similar vintage and mileage thereby putting Plaintiffs and the putative class in a position to learn of the paint defect prior to purchase or lease. The Class Vehicles would also have been less than comparable competitors' cars thereby putting Plaintiffs and the putative class in a position to learn of the paint defect prior to purchase or lease.

## CLASS ACTION ALLEGATIONS

171.    Plaintiffs bring this action on behalf of themselves and others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23. The Classes which Plaintiffs seek to represent are composed of and defined as (collectively "Class"):

    a. By Plaintiffs Ambrose, Riley, Shrum, and Kilburn, a class of all consumer residents in the United States who own, owned, lease, or leased a Class Vehicle.

    b. By Plaintiffs Ambrose and Riley, a subclass of all consumers who purchased or leased a Class Vehicle in Florida, inclusive of all such consumers residing anywhere in the United States;

    c. By Plaintiff Shrum, a subclass of all consumers who purchased or leased a Class Vehicle in California, inclusive of all such consumers residing anywhere in the United States; and

    d. By Plaintiff Kilburn, a subclass of all consumers who purchased or leased a Class Vehicle in Mississippi, inclusive of all such consumers residing anywhere in the United States.

172.    The following persons are excluded from the definition of the Class:

    a. U.S. District Court judges, magistrate judges of any U.S. District Court, judges of the U.S. Court of Appeals for the Eleventh Circuit, and U.S.

District Court personnel having any involvement with administration and/or adjudication of this lawsuit;

b. Class counsel and their employees; and

c. Employees of Defendant.

173.     This action has been brought and may properly be maintained as a Class action pursuant to the provisions of the Federal Rules of Civil Procedure, for these reasons:

a. Members of the Class are geographically distributed throughout the United States and exceed 1,000 in total so that their joinder is impractical; and

b. Common questions of law or fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.

c. Plaintiffs' claims are typical of the claims of the members of the Class under Federal Rule of Civil Procedure 23. Each member of the Class either owns, owned, leases, or leased a Class Vehicle.

d. Plaintiffs will fairly and adequately protect the interest of the Class as required by Federal Rule of Civil Procedure 23. Plaintiffs have no interests which are adverse to the interest of the Class. They have retained counsel who has substantial experience in the prosecution of Class actions.

e. The prosecution of separate actions by individual members of the Class would create the risk of (i) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendant; or (ii) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interest of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interest.

f. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and Class, causing injury to them and making Class-wide relief appropriate, specifically declaratory and injunctive relief.

g. The questions of law or fact common to the Class predominate over questions affecting only individual members. A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy under Federal Rule of Civil Procedure 23. The harm suffered by many individual members of the Class may not be great enough to warrant the expense and burden of individual litigation, which would make it difficult or impossible for individual members of the Class to redress the wrongs done to them. Individualized litigation would also

present the potential for inconsistent or contradictory judgments and would magnify the delay and expense to all parties and the court system in multiple trials of the complex factual issues of the case. By contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each Class member.

**COUNT ONE**
**(Breach of Express Warrant)**
**(for all Classes, including the Subclasses for Mississippi, California, and Florida)**

174. Plaintiffs, individually and for the Class, hereby incorporate by reference paragraphs 1 through 173 above as though fully restated herein.

175. For each Class Vehicle, an express written warranty was issued that covered the vehicle, including but not limited to the exterior paint, and warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

176. Each Plaintiff gave notice to Defendant of breach of warranty and demanded repair of the paint defect.

177. Defendant breached its warranties by offering for sale and selling defective vehicles, specifically vehicles with paint that was defective and was defectively applied, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

178.     Defendant further issued an express written warranty to the original owner, and each subsequent owner, that Defendant would make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period, without cost.

179.     Defendant breached its warranties by refusing to repair or repaint the Class Vehicles for latent defects which arose during the warranty period or refusing to do so without charge to the owners.

180.     Defendant's breach of its express warranties proximately caused the Class to suffer damages in excess of $5,000,000.00.

181.     Plaintiffs and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendant's wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiffs and the Class may be entitled.

## COUNT TWO
**(Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.)**
**(for all Classes, including the Subclasses for Mississippi, California, and Florida)**

182.     Plaintiffs, individually and for the Class, hereby incorporate by reference paragraphs 1 through 173 above as though fully restated herein.

183.    For each Class Vehicle, Defendant issued an express written warranty that covered the vehicle, including but not limited to the exterior surfaces, and warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

184.    Defendant breached its express warranties by offering for sale and selling defective vehicles that contained paint that was defective and was defectively applied, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

185.    Plaintiffs and members of the Classes are "consumers" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(3).

186.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(4) and (5).

187.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(6).

188.    Defendant's express warranties relate to the future performance of its vehicles because it promised that the Class Vehicles would perform adequately for a specified period of time or mileage, whichever came first.

189.    Defendant has breached and continues to breach its express warranties of future performance, thereby damaging Plaintiffs and Class members when their Class Vehicles fail to perform as represented due to an undisclosed paint defect.

Defendant failed and refuses to fully cover or pay for necessary inspections, repairs, and/or vehicle replacements for Plaintiffs and the Class.

190.     Plaintiffs, members of the Class, and the public will suffer irreparable harm if Defendant is not ordered to properly repair all of the Class Vehicles immediately, offer rescission to the Class by repurchasing their Class Vehicles for their full cost, reimburse the lessees of the Class Vehicles the monies they have paid toward their leases, recall all defective vehicles that are equipped with the defective paint, and cease and desist from marketing, advertising, selling, and leasing the Class Vehicles.

191.     Defendant is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

192.     Such irreparable harm includes but is not limited to likely injuries as a result of the defects to the Class Vehicles.

193.     Plaintiffs and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendant's wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Pinon and the Class may be entitled. That relief is in excess of $5,000,000.00.

## COUNT THREE
## (Equitable and Injunctive Relief)
## (for all Classes, including the Subclasses for Mississippi, California, and Florida)

194.    Plaintiffs, individually and for the Class, hereby incorporate by reference paragraphs 1 through 173 above as though fully restated herein.

195.    Plaintiffs, members of the Class, and the public will suffer irreparable harm if Defendant is not ordered to properly repair all of the Class Vehicles immediately, offer rescission to the Class by repurchasing their Class Vehicles for their full cost, reimburse the lessees of the Class Vehicles the monies they have paid toward their leases, recall all defective vehicles that are equipped with the defective paint, and cease and desist from marketing, advertising, selling, and leasing the Class Vehicles.

196.    Defendant is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

197.    Such irreparable harm includes but is not limited to likely injuries as a result of the defects to the Class Vehicles.

198.    Plaintiffs and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendant's wrongful acts and practices, restitution, the repair of all Class vehicles,

replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiffs and the Class may be entitled.

## COUNT FOUR
### (Unjust Enrichment)
### (for all Classes, including the Subclasses for Mississippi, California, and Florida)

199.    Plaintiffs, individually and for the Class, hereby incorporate by reference paragraphs 1 through 173 above as though fully restated herein.

200.    To the extent necessary, Plaintiffs bring this claim in the alternative.

201.    Defendant knew or should have known that Plaintiffs and the Class paid for the Class Vehicles with the expectation that the vehicles would perform as represented.

202.    Plaintiffs and the Class conferred substantial benefits on Defendant by purchasing the defective Class Vehicles. Defendant knowingly and willingly accepted and enjoyed those benefits.

203.    Defendant's retention of those benefits is inequitable.

204.    As a direct and proximate cause of Defendant's unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest. That relief is in excess of $5,000,000.00.

## COUNT FIVE
### (Fraud and Suppression Claim)
### (for all Classes, including the Subclasses for Mississippi, California, and Florida)

205.    Plaintiffs, individually and for the Class, hereby incorporate by reference paragraphs 1 through 173 above as though fully restated herein.

206.    Plaintiffs purchased or leased the Class Vehicles.

207.    Defendant concealed and suppressed material facts concerning the quality of the Class Vehicles.

208.    Defendant concealed and suppressed material facts concerning the quality of the exterior paint used on the Class Vehicles.

209.    Defendant concealed and suppressed material facts that the paint defect causes Class Vehicles' exterior surfaces to peel, flake, microblister, delaminate, and bubble.  Defendant knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the latent defect prior to purchasing or leasing the vehicles.

210.    At all relevant times, Defendant had the duty and obligation to disclose to the Plaintiffs and Class the defects with the paint in the Class Vehicles.  Defendant breached that duty by failing to disclose the issues with the defective paint and continuing to sell vehicles with the paint defect, despite knowledge of the issues.

211.    Defendant committed the foregoing acts and omissions in order to boost confidence in its vehicles and to falsely assure purchasers and lessees of Defendant's

vehicles that the Class Vehicles are world class, comfortable, warranted, and reliable vehicles, and it concealed the paint defect in order to prevent harm to Defendant and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the Plaintiffs' and each Class member's decisions to purchase or lease the Class Vehicles.

212.    Defendant had a duty to disclose the paint defect in the Class Vehicles because it was known and/or accessible only to Defendant; Defendant had superior knowledge and access to the facts; and Defendant knew the facts were not known to, or reasonably discoverable, by Plaintiffs and Class. Defendant also had a duty to disclose the facts because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality.

213.    As a result, the Plaintiffs and Class were misled as to the true condition of the Class Vehicles at purchase/lease and did not discover the paint defect until after the purchase/lease, at which time or shortly thereafter the Plaintiffs gave notice of the issues with the paint as alleged.

214.     The facts omitted and concealed by Defendant were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by the Plaintiffs and Class. Whether a manufacturer's products are as represented and backed by the manufacturer are material concerns to a consumer.

215.     Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of the Plaintiffs and Class.

216.     Had the Plaintiffs and Class known the truth, specifically that the paint was not durable and long-lasting and, to the contrary, was defective, they would not have purchased or leased their vehicles, or they would have paid far less to buy or lease them.

217.     Because of the concealment and/or suppression of the facts, the Plaintiffs and Class suffered pecuniary injuries, including, but not limited to, loss of value, inconvenience, and repair costs.  Defendant's fraudulent concealment of the defect was the proximate cause of those losses.

218.     Additionally, Defendant omitted, suppressed, or concealed material facts of the defective paint used on the Class Vehicles, leading to the same result: first, had the Plaintiffs and Class been informed of the truth, specifically that the paint was not durable and long-lasting and, to the contrary, was defective, they

would not have purchased or leased their vehicles, or they would have paid far less to buy or lease them; and second, the Plaintiffs and Class suffered pecuniary injuries proximately caused by Defendant's suppression of the material facts of the defect, and those injuries include, but are not limited to, loss of value, inconvenience, and repair costs. Those injuries exceed $5,000,000.00.

## COUNT SIX
### (Violation of Florida's Unfair and Deceptive Trade Practices Act, "FUDTPA")
### (for Florida Subclass)

219.    Plaintiffs Riley and Ambrose, individually and for the Florida Subclass, hereby incorporate by reference paragraphs 1 through 173 above as though fully restated herein.

220.    Plaintiffs and the Florida Subclass members are "consumers" within the meaning of FLA. STAT. §501.203(7), and they purchased or leased Class Vehicles in Florida.

221.    Defendant is engaged in "trade" or "commerce" within the meaning of FLA. STAT. §501.203(8).

222.    The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. §501.204(1).

223.    Defendant violated FDUPTA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint used on the Class Vehicles. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by FLA. STAT. §501.204(1):

a.  representing that the Class Vehicles have characteristics or benefits that they do not have;

b.  representing that the Class Vehicles are of a particular standard and quality when they are not;

c.  advertising the Class Vehicles with the intent not to sell them as advertised;

d.  engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

e.  using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

224.     At all times relevant, Defendant knew that it was designing, manufacturing, distributing, selling, and warranting Class Vehicles in Florida and throughout the United States that contained defective paint.

225.     Defendant's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and the Florida Subclass, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Florida Subclass would rely on the misrepresentations, concealments, and omissions.

226.     Had they known the truth, Plaintiffs and the Florida Subclass would not have purchased or leased the Class Vehicles or would have paid significantly less for them.

227.     Plaintiffs and the Florida Subclass had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

228.     Defendant had an ongoing duty to Plaintiffs and the Florida Subclass to refrain from unfair and deceptive practices under FDUTPA in the course of their business.

229.     Defendant owed Plaintiffs and the Florida Subclass a duty to disclose all the material facts concerning the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed such material facts from Plaintiffs and the

Florida Subclass, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

230.     Plaintiffs and the Florida Subclass suffered ascertainable losses and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information. Those injuries exceed $5,000,000.00.

**COUNT SEVEN**
**(Strict Products Liability - Design Defect)**
**(for California Subclass)**

231.     Plaintiff Shrum, individually and for the California Subclass, hereby incorporates by reference paragraphs 1 through 173 above as though fully restated herein.

232.     Plaintiff and Subclass purchased or leased Class Vehicles in California.

233.     At all relevant times, the Defendant designed, manufactured, distributed, and/or sold the Class Vehicles.

234.     At all relevant times, the Defendant controlled the design, manufacturing and/ or distribution process for the Class Vehicles.

235.     As designed, manufactured, distributed, and/or sold by the Defendant, the Class Vehicles reached the Plaintiff and Subclass, and were thereafter used by them without substantial change, in the condition in which they were distributed and sold.

236.     As distributed and sold, the Class Vehicles, or "products," are defective in design in that they do not and did not perform the manner an ordinary consumer would have expected them to perform when used in an intended or reasonably foreseeable way. The products' failure to perform as expected was and is a substantial factor in economic harm suffered by the Plaintiff and Subclass.  That harm is conspicuous physical damage to the Class Vehicles, which are or were property of the Plaintiff and Subclass.

237.     As a result of the products' failure to perform as expected, the Plaintiff and Subclass have incurred and will incur significant economic loss.

238.     As a direct and proximate cause of the products' failure to perform as expected, and the damage to property that occurred due to that failure, Plaintiff and Subclass are entitled to damages in excess of $5,000,000.00 to compensate them for their economic loss.

**COUNT EIGHT**
**(Violations of the Unfair Competition Law, or "UCL," Bus. & Prof. Code §§ 17200  et seq.)**
**(for California Subclass)**

239.     Plaintiff Shrum, individually and for the California Subclass, hereby incorporates by reference paragraphs 1 through 173 above as though fully restated herein.

240.     Plaintiff and Subclass purchased or leased Class Vehicles in California.

241.   The California UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

242.   The Defendant has engaged in unlawful, unfair and fraudulent business acts and practices in violation of the UCL in at least the following ways:

    a.   Defendant concealed and suppressed material facts concerning the quality of the Class Vehicles.

    b.   Defendant concealed and suppressed material facts concerning the quality of the exterior paint used on the Class Vehicles.

    c.   Defendant concealed and suppressed material facts that the paint defect causes Class Vehicles' exterior surfaces to peel, flake, microblister, delaminate, and bubble.

    d.   At the time of these acts, Defendant knew that Plaintiff and Subclass would not be able to inspect or otherwise detect the latent defect prior to purchasing or leasing the vehicles.

    e.   At all relevant times, Defendant had the duty and obligation to disclose to the Plaintiff and Subclass the defects with the paint in the Class Vehicles. Defendant breached that duty by failing to disclose the issues with the defective paint and continuing to sell vehicles with the paint defect, despite knowledge of the issues.

f.  Defendant committed the foregoing acts and omissions in order to boost confidence in its vehicles and to falsely assure purchasers and lessees of Defendant's vehicles that the Class Vehicles are world class, comfortable, warranted, and reliable vehicles, and it concealed the paint defect in order to prevent harm to Defendant and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in the decisions by the Plaintiff and Subclass to purchase or lease the Class Vehicles.

g.  Defendant had a duty to disclose the paint defect in the Class Vehicles because it was known and/or accessible only to Defendant; Defendant had superior knowledge and access to the facts; and Defendant knew the facts were not known to, or reasonably discoverable, by Plaintiff and Subclass. Defendant also had a duty to disclose the facts because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality.

h. As a result of these acts and omissions by the Defendant, the Plaintiff and Subclass were misled as to the true condition of the Class Vehicles at purchase/lease and did not discover the paint defect until after the purchase/lease, at which time or shortly thereafter the Plaintiffs gave notice of the issues with the paint as alleged.

i. The facts omitted and concealed by Defendant were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by the Plaintiff and Subclass. Whether a manufacturer's products are as represented and backed by the manufacturer are material concerns to a consumer.

j. Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of the Plaintiff and Subclass.

k. Had the Plaintiff and Subclass known the truth, specifically that the paint was not durable and long-lasting and, to the contrary, was defective, they would not have purchased or leased their vehicles, or they would have paid far less to buy or lease them.

l. Because of the concealment and/or suppression of the facts, the Plaintiff and Subclass suffered pecuniary injuries, including, but not limited to,

loss of value, inconvenience, and repair costs.  Defendant's fraudulent concealment of the defect was the proximate cause of those losses.

m. Additionally, Defendant omitted, suppressed, or concealed material facts of the defective paint used on the Class Vehicles, leading to the same result: first, had the Plaintiff and Subclass been informed of the truth, specifically that the paint was not durable and long-lasting and, to the contrary, was defective, they would not have purchased or leased their vehicles, or they would have paid far less to buy or lease them; and second, the Plaintiff and Subclass suffered pecuniary injuries proximately caused by Defendant's suppression of the material facts of the defect, and those injuries include, but are not limited to, loss of value, inconvenience, and repair costs. Those injuries exceed $5,000,000.00.

243.   At all times relevant, Defendant knew that it was designing, manufacturing, distributing, selling, and warranting Class Vehicles in California and throughout the United States that contained defective paint.

244.   The acts and omissions alleged were consistent with and part of the Defendant's scheme to profit from its design, manufacturing, distribution, and or sale of the Class Vehicles, at the expense of Plaintiff and Subclass.

245.   The Plaintiff and Subclass could not have reasonably avoided injury from Defendant's unfair conduct.  At the time of purchase or lease, and thereafter

until after the paint defect manifested and damaged the value of all Class Vehicles, Plaintiff and Subclass did not know of, and had no reasonable means of learning, the paint defect in the Class Vehicles.

246.    As a result, the Plaintiff and Subclass were and are harmed, and Defendant's misleading statements and omissions are a substantial factor in causing that harm.

247.    Accordingly, Plaintiff and Subclass have suffered injury in fact including lost money as a result of Defendant's unlawful, unfair and fraudulent business practices.

248.    Plaintiff and Subclass seek to enjoin further unlawful, unfair and fraudulent acts or practices by Defendant under Bus. & Prof. Code § 17200.

249.    Plaintiff and Subclass request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair and deceptive practices and to restore to Plaintiff and Subclass any money it acquired by unfair competition, including restitution and/or disgorgement, as provided by the UCL, in a sum exceeding $5,000,000.00, and for other relief that may be in order.

## COUNT NINE
### (Violation of the Mississippi Consumer Protection Act, or "MCPA")
### (For Mississippi Subclass)

250.    Plaintiff Kilburn, individually and for the Mississippi Subclass, hereby incorporates by reference paragraphs 1 through 173 above as though fully restated herein.

251.    The Mississippi Consumer Protection Act (MCPA), specifically Miss. Code Ann. § 75-24-5, proscribes and penalizes "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices," including, but not limited to, "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have," and/or "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  It also proscribes and penalizes any advertising of goods with intent not to sell them as advertised.

252.    Plaintiff and Subclass members are natural persons and consumers within the meaning of the MCPA.  They purchased or leased Class Vehicles in Mississippi.

253.    Defendant is a person subject to the MCPA.

254.   Defendant's conduct complained of herein affected trade, commerce or consumer transactions within the meaning of the MCPA.

255.   Defendant violated the MCPA by engaging in unfair or deceptive acts, including representing that Class Vehicles have characteristics or benefits that they did not have; representing that Class Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Class Vehicles with intent not to sell them as advertised.

256.   In the course of its business, Defendant utilized and applied defective paint and concealed that it was defective, as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

257.   Defendant has known of its use of the defective paint and the true nature of it since at least 2015, but concealed all of that information until recently and after Plaintiff and Subclass purchased Class Vehicles.

258.   Defendant was also aware that it valued profits over lawfulness, and that it was designing, manufacturing, distributing, selling, and warranting Class

Vehicles in Mississippi and throughout the United States that contained defective paint.

259.     By failing to disclose and by actively concealing the paint defect, by marketing its vehicles as containing high quality paint, and by presenting itself as a reputable manufacturer that valued quality, and stand behind its vehicles after they were sold, Defendant engaged in unfair and deceptive business practices in violation of the MCPA.

260.     In the course of Defendant's business, it willfully failed to disclose and actively concealed the paint defects discussed above. Defendant compounded the deception by repeatedly asserting that the Class Vehicles contained high quality paint, and by claiming to be a reputable manufacturer that stood behind it vehicles once they are on the road.

261.     Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass, about the true characteristics of the defective paint, the quality of the Defendant's brand, the degraded integrity at Defendant, and the true value of the Class Vehicles.

262.     Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and Subclass.

263.     Defendant knew or should have known that its conduct violated the MCPA.

264.    As alleged above, Defendant made material statements about the paint on the Class Vehicles that were either false or misleading.

265.    Defendant owed Plaintiff and the Subclass a duty to disclose the true nature of the Class Vehicles and the devaluing of the Class Vehicles because they:

a. Possessed exclusive knowledge that they valued profits over lawfulness, and that they were manufacturing, selling and distributing vehicles throughout the United States that contained paint defects;

b. Intentionally concealed the foregoing from Plaintiff and Subclass; and/or

c. Made incomplete representations about the paint on the Class Vehicles generally, and the paint defect, while purposefully withholding material facts from Plaintiff and Subclass that contradicted these representations.

d. Because Defendant fraudulently concealed the paint defect, resulting in a raft of negative publicity once the paint defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

e. Defendant's fraudulent concealment of the paint defect was material to Plaintiff and Subclass. A vehicle made by a reputable manufacturer with appropriate non-defective paint is worth more than an otherwise

comparable vehicle made by a disreputable and dishonest manufacturer such as Defendant.

266.    Plaintiff and Subclass suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and Subclass either would have paid less for their Class Vehicles or would not have purchased or leased them at all.

267.    As a direct and proximate result of Defendant's violations of the MCPA, Plaintiff and Subclass have suffered injury-in-fact and/or actual damage. That injury and damage exceeds $5,000,000.00.

268.    Pursuant to the MCPA, Plaintiff and Subclass seek monetary relief against Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendant's willful or knowing violations, and any other just and proper relief available under the MCPA.

**COUNT TEN**
**(Negligent Misrepresentation)**
**(For Mississippi Subclass)**

269.    Plaintiff Kilburn, individually and for the Mississippi Subclass, hereby incorporates by reference paragraphs 1 through 173 above as though fully restated herein.

270.    The Plaintiff and Subclass purchased or leased Class Vehicles in Mississippi.   As the buyers or lessees, they are entitled to damages from the Defendant for negligent misrepresentation because –

a.    the Defendant misrepresented or omitted a fact to them, namely the paint defect in the Class Vehicles;

b.    the representation or omission is material or significant;

c.    in making the misrepresentation or omission, the Defendant failed to exercise that degree of diligence and expertise the Plaintiff and Subclass is entitled to expect of it;

d.    the Plaintiff and Subclass reasonably relied upon the misrepresentation or omission; and

e.    the Plaintiff and Subclass suffered damages as a direct and proximate result of such reasonable reliance.

271.    The damages on this claim exceed $5,000,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request an order and judgment against Defendant which –

1. Certifies the Class and appoints Plaintiffs and their counsel to represent the Class.

2. Grants declaratory judgment to Plaintiffs and Class.

90

3. Enjoins Defendant from doing the wrongs alleged.

4. Awards compensatory damages to Plaintiffs and Class in the utmost amount allowed by law.

5. Awards punitive damages against the Defendant in favor of Plaintiffs and Class in the utmost amount allowed by law.

6. Awards a reasonable attorneys' fees to Plaintiffs and Class, as prescribed by law and for the common and public good obtained in this action.

7. Grants such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## DEMAND FOR A JURY TRIAL

Plaintiffs and the Class hereby demand a trial by struck jury on all issues.

Dated this 24th day of June 2022.

Respectfully submitted,

*/s/ Jason R. Fraxedas*
Jason R. Fraxedas (FL# 63887)
Matthew S. Mokwa (FL# 47761)
THE MAHER LAW FIRM, P.A.
398 W. Morse Blvd., Suite 200
Winter Park, FL 32789
Phone: (407) 839-0866
Fax: (407) 425-7958
jrfraxedas@maherlawfirm.com
mmokwa@maherlawfirm.com

Taylor C. Bartlett
(pro hac vice forthcoming)
W. Lewis Garrison, Jr.
(pro hac vice forthcoming)
HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
Birmingham, Alabama 35203
Telephone:   (205) 326-3336
Facsimile:    (205) 326-3332
taylor@hgdlawfirm.com
lewis@hgdlawfirm.com

Steve Jackson
(pro hac vice forthcoming)
Jackson & Tucker, P.C.
Black Diamond Building
2229 First Avenue North
Birmingham, AL 35203
Phone: 205-252-3535
Fax: 205-252-3536
steve@jacksonandtucker.com

*Attorneys for Plaintiffs*