# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | | |
|---|---|---|
| TOM RILEY, GARY AMBROSE individually, and on behalf of all others similarly situated, | ) ) ) ) | Case No.: 22-cv-499 |
| Plaintiffs, | ) ) | CLASS REPRESENTATION |
| vs. | ) ) | |
| GENERAL MOTORS LLC, | ) ) | |
| Defendant. | ) ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1.     Plaintiffs Tom Riley and Gary Ambrose (collectively, "Plaintiffs") bring this putative class action complaint against Defendant General Motors LLC ("Defendant" or "GM").

2.     Plaintiffs bring this action individually and on behalf of all others similarly situated and allege upon personal knowledge, information, and belief that Defendant is liable to them and the proposed Class under federal and state law for the design, manufacturing, marketing, and sale of vehicles with defective paint.

1

3.     The vehicles at issue in this litigation include, but may not be limited to, the 2015-2019 Chevrolet Tahoe, 2015-2019 Chevrolet Suburban, 2015-2019 GMC Yukon, 2015-2019 GMC Yukon XL, and ("Class Vehicles).[1]

4.     This action is brought to remedy violations of law in connection with Defendant's designing, manufacturing, marketing, advertising, selling, warranting, and servicing of the Class Vehicles.  The Class Vehicles were all painted by Defendant, and the paint has a serious latent defect that causes the exterior surfaces of the Class Vehicles to peel, crack, become cloudy, and delaminate without any external or environmental influence.

5.     Defendant knew, or should have known, prior to Plaintiffs' purchases that the paint itself (and any clear coating) was defective, and that its application of the defective paint (and any clear coating) further contributed to the cracking, cloudiness, peeling and delamination. Although defect manifested over time, Defendant knew or should have known of those issues prior to sale of the Class Vehicles; yet Defendant continued to put the latently defective Class Vehicles on the market.

---

[1] This list includes all affected models and model years, upon information and belief, and discovery will enable Plaintiffs to precisely determine which model-years share the same uniform (and uniformly defective) paint.

6.      Defendant breached its express warranty by continuing to sell the defective Class Vehicles and refusing to remedy the issues; instead, it actively concealed them from Plaintiffs and the putative class.

7.      Defendant fraudulently concealed the issues with the paint on the Class Vehicles in violation of various state consumer protection laws.

## **PARTIES**

8.      Plaintiff Tom Riley ("Riley") is an adult resident and citizen of Pinellas County, Florida.

9.      Plaintiff Gary Ambrose ("Ambrose") is an adult resident and citizen of Orange County, Florida.

10.     Defendant is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation with its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.

11.     Defendant designed, manufactured, marketed, distributed, sold, leased, and warranted the vehicles at issue.  Defendant also developed and disseminated the manuals, warranty booklets, advertisements, and promotional materials relating to the Class Vehicles.  It took those actions to distribute Class Vehicles for sale in Florida, purposely availing itself of the laws of that state and accounting for the purchase or lease of the Class Vehicles by the Plaintiffs and Class.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

13.     This Court also has federal question jurisdiction over this action under 28 U.S.C. § 1331 because this case includes claims arising under federal law.

14.     This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367(a).

15.     This Court has personal jurisdiction over Defendant because it is authorized to do business in this judicial district, conducts substantial business in the judicial district, and some of the actions giving rise to the complaint took place in the judicial district. Each of these facts independently, but also all of these facts

together, are sufficient to render the exercise of jurisdiction by this Court over Defendant permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because Defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTS

### A. Riley's Facts

17.     In October 2016, Riley purchased a new 2016 Green Chevrolet Suburban, Vehicle Identification No. 1GNSKJKC6GR315396 from AutoNation Chevrolet South in Clearwater, Florida.

18.     AutoNation Chevrolet South in Clearwater, Florida is an authorized Chevrolet dealership.

19.     At the time Riley purchased his vehicle, it was new and came with a standard Chevrolet three year 36,000-mile new vehicle bumper to bumper express limited warranty.

20.     One of the main and important reasons for Riley selecting his Class Vehicle was the paint which Defendant touted extensively to him as superior, of professional grade, and containing a clear coat which protected his vehicle.

21.     Prior to his purchase, and mainly in early to mid-2016, Riley saw Defendant's newspaper, magazine, social media, and television ads touting that the Class Vehicles both new and used were reliable, endurable, of good finish, of high fit, of professional grade, and exceptional quality.  Plaintiff relied on Defendant's representations in making his purchase.

22.     The warranty Riley received is the same as the one each Class Member received, whether they purchased their vehicle directly through Defendant or through a subsequent used-car retailer.

23.     Riley's Class Vehicle has not been wrecked nor has it been repainted – it has the original paint from Defendant's factory.

24.     Riley purchased his Class Vehicle for his personal, family, and household use.

25.     His Class Vehicle was not exposed to any unexpected airborne or environmental influences which would have adversely affected its paint.

26.     Riley was particularly careful about his Class Vehicle's paint in that he regularly monitored it for any signs of damage and maintained it properly in accordance with Defendant's recommendations.

27.     Riley expected his Class Vehicle to be of good and merchantable quality, and not defective. He had no reason to know, or expect, that the paint on his

Class Vehicle was defective.  Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

28.      As part of Riley's careful and diligent nature concerning his Class Vehicle, upon inspecting his paint he first noticed problems with the paint in mid-2019.  Riley was able to apply additional car care wax to the hood making the imperfections appear to resolve.

29.      The paint and clear coat condition continued to deteriorate and in May 2021, when it was obvious that there was a systemic problem with his paint, Riley took his Class Vehicle to the AutoNation authorized Chevrolet dealership in Clearwater, Florida.  The dealership acknowledged that there was an issue with his paint, but Defendant denied the issue citing customer neglect and environmental issues and declined warranty coverage.

30.      Instead of repairing or replacing the paint under warranty, Defendant agreed to pay only $1,000 of the total estimate of $3,000 to repair and/or replace the defective paint claiming that Riley was at fault for the damage to his paint.

31.      During the May 2021 visit, dealership personnel acknowledged that the paint was defective and that they were aware of multiple other similar vehicles having the same problem.  However, Defendant denied warranty coverage and told Riley he was at fault and that there was no defect in the paint.

32.      The paint continued to get worse showing defects in many body panels.

33.      Today, to repair and repaint Riley's Class Vehicle, he would have to pay more than $10,000.  Repainting the car would require sanding the vehicle to the bare metal and would substantially depreciate the value of the vehicle.  There is no short cut – the Class Vehicles must be sanded and repainted.

34.      The same defective paint and clearcoat was applied to all Class Vehicles.

35.      Ultimately, Defendant has refused to fully repair or replace Riley's vehicle, despite acknowledging the common defect.

36.      Although it is difficult to see the extent of the defect via pictures, the following pictures show Riley's paint today and the obvious defects:







37.     Riley's vehicle is just one of tens of thousands of Class Vehicles that suffer from an irreparable defect in the exterior paint that results in peeling, cracking, cloudiness, flaking, bubbling, erosion, and microblistering of the clearcoat.

38.     Riley expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the paint on his Class Vehicle was defective. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

39.     Riley would purchase another vehicle of Defendant if Defendant is ordered to correct its paint defects and to ensure future defects are not concealed.

**B. Ambrose's Facts**

40.     On March 29, 2014, Ambrose purchased a new Black 2015 GMC Yukon XL VIN: 1GKS1HKC2FR114764 at Carl Black GMC in Orlando, Florida, an authorized GMC dealership.

41.     At the time Ambrose purchased his vehicle, it was new and came with a standard GMC three year 36,000-mile new vehicle bumper to bumper express limited warranty.

42.     The warranty Ambrose received is the same as the one each Class Member received, whether they purchased their vehicle directly through Defendant or through a subsequent used-car retailer.

43.     One of the main and important reasons for Ambrose selecting his Class Vehicle was the paint, which Defendant touted extensively as superior, of professional grade, and containing a clear coat which protected the vehicle.

44.     Prior to his purchase, and primarily in mid-March 2014, Ambrose saw newspaper, magazine, internet, and television ads touting that the Class Vehicles both new and used were reliable, endurable, of good finish, of high fit, of professional grade, and exceptional quality. Ambrose relied on Defendant's representations in making his purchase.

45.     The last advertisement Ambrose recalls seeing prior to purchase was in conjunction with a PGA event in Orlando Florida in mid-March 2014. Defendant promoters utilized the GMC Yukons to ferry PGA players.  These promoters represented to Ambrose and the public that the Yukons' quality, reliability, professional grade, history, and prestige were top notch and of the highest and finest quality.

46.     Defendant utilized PGA player spokespersons to state to Ambrose and the public how impressed they were with the quality of the Yukon, implying that these PGA players who owned Porsches, Mercedes, and Ferraris compared the Yukon's quality to those high-end vehicles and that the Yukon was the top of the line.

47.     Ambrose also recalls GMC advertisements that the new Yukon was "more everything" than the prior models, meaning that it was more reliable, more high quality, and more luxurious.

48.     In early 2017 when his Class Vehicle had less than 36,000 miles on it, and while his Class Vehicle was still under its new vehicle bumper to bumper express limited warranty, Ambrose began noticing issues with the paint on his Class Vehicle.  Specifically, his paint was developing a haze underneath the clear coat and the clear coat appeared to be deteriorating.

49.     As a reasonable car owner and knowing that his new vehicle limited warranty would soon expire, Ambrose took his Class Vehicle to Carl Black, Defendant's authorized dealer, in early 2017 (before three years after his purchase date) and with less than 36,000 miles on it to address his warrantable paint concern and requested repair.  Carl Black inspected the paint and offered only to "detail" it and apply more wax, but nothing else, because Carl Black indicated that Defendant who must authorize such warranty repairs believed such paint issues to be the fault of owners not properly taking care of their vehicle.

50.     At that time, Ambrose believed that Defendant, through its authorized dealer, was addressing his warrantable paint concern; but, the placing of wax was insufficient as the paint issue was not the result of an environmental or customer caused issue – it was a defect.  Defendant, at that time, knew or should have known of the defect but had not disclosed it to Carl Black and Ambrose, concealing it, and Defendant knew that placing wax on Ambrose's vehicle would not repair the defect.

51.     In September of 2018, Ambrose took his Yukon for service and after a another detail by Carl Black, the authorized GMC dealership, to try and fix the paint issues, the clear coat delamination and deterioration were still apparent.  The body shop manager at Carl Black informed Ambrose that the paint problems he was experiencing were common to all Yukon's yet Defendant continued to take the position that it was the result of customer neglect or fault.

52.     Ambrose's Class Vehicle was not exposed to any unexpected airborne or environmental influences which would have adversely affected its paint.

53.     Ambrose purchased his Class Vehicle for his personal, family, and household use.

54.     Ambrose was always mindful about his Class Vehicle's paint in that he regularly monitored it for any signs of damage and maintained it properly in accordance with Defendant's recommendations.

55.     Ambrose subsequently notified Carl Black GMC, an authorized GMC dealership, of the paint issues, but received a response stating that Defendant had refused to repair and/or replace the paint at Defendant's cost and under warranty. Defendant continued its knowingly false position that there was no defect and that the paint issue was the result of Ambrose's neglect.

56.     Ambrose remained unsatisfied with the denial of warranty.  Defendant was later notified a subsequent time of Ambrose's warranty claim and Defendant again declined to repair and/or replace the defective paint at its cost.   Instead, Defendant offered to cover only "33% of the total repair" which required Ambrose to pay $1,1170.62 to repair the paint only on the hood and roof rails.

57.     Ultimately, after much hassle, the dealership paid the $1,1170.62 to repair the paint on the hood and roof rails, but Defendant has refused to provide any compensation or repair and/or replace the remaining defective paint which is

apparent                  in            the             following              pictures:







58.     While the dealership agreed to repaint the hood and roof rails of Ambrose's Class Vehicle, the remedy is insufficient for at least the following reasons: 1) the new paint is only on two sections of the car and not the entire car 2) repainting a car substantially decreases its value, 3) the repainting is done by hand and not by robots in a sterile environment at the factory thus preventing the same finish originally promised, 4) the bumpers are not repainted to match which leaves their color different from the repainted metal, 5) the repair process took about one month to complete, 6) Ambrose was substantially inconvenienced, and 7) Ambrose

will be unable to resell his Class Vehicle at fair market value as it will be branded forever as "repainted."

59.     The same defective paint and clearcoat was applied to all Class Vehicles.

60.     Ambrose expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know, or expect, that the paint on his Class Vehicle was defective. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

61.     Ambrose would purchase another vehicle of Defendant if Defendant is ordered to correct its paint defects and to ensure future defects are not concealed.

### C. General Facts

62.     Plaintiffs and the putative class sought out the Class Vehicles and purchased the Class Vehicles intentionally after seeing and relying on Defendant's promises, warranties, and advertisements.   Each Class Vehicle is a luxury vehicle that comes with a high price tag, and the price is indicative of a vehicle that is superior to others in looks, drivability, fit, and finish.

63.     The condition of the exterior paint on Class Vehicles is an important aspect of their overall value, is considered by first purchasers as well as secondary purchasers, and it often determines whether a car will sell at fair market value or not.

64. The defects in the Class Vehicles' paint have affected the resale and value of the Class Vehicles. Defendant recognizes this as it advertises the quality of its paint and offers lower values for cars with paint problems such as those on the Class Vehicles. This is proven by the fact that Defendant seriously discounts its offers for any buybacks or secondary purchases of Class Vehicles.

65. The defects in the Class Vehicles' paint stem from one of three sources: 1) a defect in the paint itself, 2) a defect in the clear coat, or 3) a defect in the application of the paint and/or clearcoat. Any or all of these defects will cause the paint and clear coat to microblister, crack, become cloudy, delaminate, peel, fade, and bubble.

66. Each Class Vehicle was manufactured at single manufacturing plant, Defendant's Arlington Assembly Plant.

67. Defendant knew, or should have known, that prior to marketing and selling the Class Vehicles to Plaintiffs and the putative class that the clear coat which is supposed to protect the paint and the Class Vehicle's body, was defective and/or was defectively applied. The paint and the clear coat were chemically unable to appropriately bond or one or both products were defective, thereby causing the above-described issues.

68. Notwithstanding this long-standing problem and extensive knowledge of the issues prior to Plaintiffs' purchases, Defendant continued to advertise and sell

the Class Vehicles and failed to issue an appropriate recall. It knowingly failed to provide truthful information about the defects of the paint.

69.     The defects in the paint that Plaintiffs and the putative class are experiencing are not the "Chemical Paint Spotting" noted in Defendant's warranty booklets.  This is because the defect does not manifest itself as "blotchy, ring-shaped discolorations, and/or small irregular dark spots etched into the paint surface."

70.     Defendant benefitted from Plaintiffs' and the putative class' purchases of the Class Vehicles.  For those Plaintiffs and putative class members who purchased new vehicles, Defendant received revenue from the sale.

71.     For those Plaintiffs and putative class members who purchased used vehicles, Defendant received a benefit because the purchases increased the used market prices, thereby allowing Defendant to charge more for its new vehicles.

72.     For each Class Vehicle, Defendant issued an express warranty which covered the vehicle, including but not limited to, the exterior paint, warranting it to be free of defects in materials and workmanship at the time of purchase or lease.

73.     This warranty was a material factor in Plaintiffs' decisions to purchase Class Vehicles.

74.     Pursuant to its express warranties, Defendant warranted the Class Vehicles, including the exterior surfaces, to be free of defects in design, materials, and workmanship, and warranted that repairs or replacements necessary to correct

defects in material or workmanship arising during the first 36 months or 36,000 miles, whichever came first, would be made by authorized dealers, without charge.

75.     Defendant breached its warranties for the Class Vehicles as a result of the latent defect with the paint. Despite acknowledging the defect, Defendant breached its warranties by failing to repair the paint as warranted, and otherwise continuing to use the defective paint on its Class Vehicles.

76.     In breach of Defendant's warranties, the Class Vehicles are defective, unfit for the ordinary purposes for which they are intended to be used, and not merchantable.

## Procedural and Substantive Unconscionability of the New Vehicle Limited Warranty

77.     Defendant's New Vehicle Limited Warranty time limit is procedurally and substantively unconscionable.

78.     Defendant's New Vehicle Limited Warranty is an adhesion contract because Plaintiffs and the Class are individual consumers and Defendant is a commercial enterprise.

79.     Defendant drafted the New Vehicle Limited Warranty.  Plaintiffs and the Class had no part in drafting it.

80.     Plaintiffs, and the Class, are individual consumers who purchased or leased Class Vehicles through Defendant's independent dealer network or from a third party.

81.     In purchasing and leasing negotiations of Class Vehicles, Plaintiffs, the Class, and Defendant never directly interacted and there is never an opportunity for Plaintiffs or the Class to negotiate with Defendant the terms of the New Vehicle Limited Warranty.

82.     The New Vehicle Limited Warranty is presented on a take-it-or-leave-it basis, and if Plaintiffs and the Class sought to purchase or lease a Class Vehicle they must accept the three year limitation of the New Vehicle Limited Warranty.

83.     In purchasing or leasing Class Vehicles, Plaintiffs and the Class interacted only with Defendant's authorized dealers or third parties.  Those dealers and third parties have no authority to modify the terms of the New Vehicle Limited Warranty thus precluding any negotiations of any sort between Plaintiffs and the Class with Defendant over its terms.

84.      Defendant's authorized dealers and third parties were never informed by Defendant of the latent paint defect and thus could never have informed Plaintiffs and the Class that the three year time limit of the New Vehicle Limited Warranty would expire prior to the latent paint defect manifesting.  Thus, no one involved in the actual sale or lease of a Class Vehicle had knowledge of the latent paint defect, which bolstered Defendant's unreasonable knowledge advantage.

85.     At the time the Plaintiffs, and the Class, purchased or leased their Class Vehicles, they were unaware of the latent paint defect, yet Defendant was aware of

it, *see infra* ¶¶102-127 & 135-153, thereby creating unequal bargaining power because Defendant knew of the latent defect but the Plaintiffs and the Class did not and could not have known of it.

86.     Defendant . Exh. 1 at 153:6-14 (Hodapp Dep). Defendant's failure to communicate with dealerships and customers is an example of active and willful concealment.

87.     At the time of the sale or lease of the Class Vehicles, Defendant had unfair bargaining power because it knew that the three year time limit would expire prior to the latent paint defect manifesting itself ████████████████████ Exh. 2 at 893 (GM000171890).

88.     Because only Defendant was aware of the latent paint defect's manifestation ██████████████████ *Id.*, and Defendant limited the New Vehicle Limited Warranty to three years it had an unjust and undeserved advantage when the Plaintiffs and Class purchased or leased Class Vehicles.

89.     Plaintiffs, and the Class, lacked any meaningful choice in accepting the time limit of the warranty and had no ability to negotiate its natural length.  In fact,

Plaintiffs and the Class either had to take the warranty as written by Defendant or decline to purchase their Class Vehicle.

90.     Had Plaintiffs and the Class known that the latent paint defect would not manifest until ██████████████████████ *Id.*, and Defendant had provided a way to negotiate its length then Plaintiffs and the Class would have demanded a warranty period greater than "4+" years such that the latent paint defect would have manifested prior to the natural expiration of the New Vehicle Limited Warranty.

**<u>Defendant's Marketing and Concealment</u>**

91.     Defendant knowingly manufactured and sold the Class Vehicles with the paint defect, while willfully concealing the true inferior quality and sub-standard performance of the Class Vehicles' exterior paint.

92.     Defendant directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the internet, billboards, print publications, mailings, and through other mass media, including to Plaintiffs.

93.     Defendant's marketing material describes the various Class Vehicles as "the best SUV," "awesome," "luxurious," "professional grade," and "the one that performs." Defendant's slogan for its Class Vehicles was "the new premium."

94.     Defendant itself has recognized the importance of the quality of paint used on its Class Vehicles.  Defendant specifically identifies paint as being a covered

warranty item in its warranty booklet and acknowledges that defects are "normally corrected during the new vehicle preparation."

95.    Here, for the Class Vehicles, the paint defect was not corrected during the new vehicle preparation.

96.    Although Defendant knew of the clear coat's propensity to peel, become cloudy, crack, blister, flake, delaminate, and bubble on Class Vehicles, it failed to notify Plaintiffs and Class Members of this prior to their purchase.

97.    When Plaintiffs purchased their vehicles, they relied upon representations of Defendant that the cars had been inspected and any paint defects were "taken care of" prior to placing the vehicles on the market.

98.    As a result, each Plaintiff expected that the paint and application process used on the Class Vehicles would not cause its clearcoat to peel, become cloudy, crack, flake, delaminate, or bubble under normal conditions, and cause other problems that would negatively impact the value of the Class Vehicles.

99.    Plaintiffs and the putative class were exposed to Defendant's pervasive, long-term, national, multimedia marketing campaign touting the supposed quality and durability of the Class Vehicles and their component parts, including paint, and they justifiably made their decisions to purchase their Class Vehicles based on Defendant's misleading marketing that concealed the true, defective nature of the paint used on the Class Vehicles.

100.     Plaintiffs and Class, in deciding to purchase the Class Vehicles, relied upon Defendant to inform the public and potential purchasers of any defects in the Class Vehicles, including defects in the paint.

101.     Defendant failed to inform Plaintiffs and Class of the defect with the paint, and Plaintiffs and Class would not have purchased the vehicles had they known of the defects in the paint, or they would have paid a much lower price for the vehicles had they known of the defect.

**A.     Defendant Knew of the Paint Defect Prior to Sale or Lease of the Class Vehicles Yet Concealed Its Knowledge.**

102.     Defendant was aware of irreparable defects with the paint and clear coat used on Class Vehicles.  Defendant was aware of these defects at the time it advertised and sold the Class Vehicles and thereafter when it continued to disseminate information about the vehicles for those Plaintiffs and putative class members who purchased their Class Vehicles on the secondary market.



103.     ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████" Exh. 3 (GM000169236).

104.     ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████" Exh. 4 at 507 (GM000162503).

105. ███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ Exh. 5 (GM000169690-700 –

dated from metadata).

106. "████████████████████████████████████████

████████████████████████████████████████████ Exh. 6

(GM000168236).

107. ███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Exh. 7 at 5

(GM000172933).

108. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

*Id.*

109. ███████████████████████████████████████

████████████████████████████████████████████████

████████" *Id.* at 3, 4, & 5.

110. ███████████████████████████████████████

████████████████████████████████████████████████



111. ████████████████████████████████████████

████████████████████████████████████████ Exh.  8

(GM000172764 – filtered spreadsheet confirming ██████████████

██████████████.

112. ████████████████████████████████████████

████████████████████████████████████████ *Id.*

113. ████████████████████████████████████████

████████████████████████████████████████ *Id.*

114. ████████████████████████████████████████

████████████████████████████████████████

██████████████████████

115.     At those times, the defects with the paint and clearcoat that Defendant knew about, or should have known about, included -- but were not limited to -- defects in the manufacture, process, materials, and workmanship of the vehicle. Defendant failed to inform Plaintiffs and the putative class about the defects, and the defects have rendered the vehicle unmerchantable.

116.     Prior to a new paint and/or paint system being used on a vehicle, automakers such as Defendant are known to employ multiple standards and test

protocols to ensure long life and film integrity of the paint system as well as the underlying substrate. In addition to extensive exterior and accelerated weathering evaluation of clearcoats, there is additional aggressive testing prior to the qualification of an automotive coating system to ensure the paint system will provide long lasting protection when exposed to environmental elements. These tests often run over the course of two-to-five years before a vehicle using the paint system is brought to market.

117.  Most of these test procedures are developed and standardized by the American Society for Testing and Materials ("ASTM") and the Society of Automotive Engineers ("SAE"), and typically include:

a.  accelerated weathering tests to assess paint color, gloss retention, and appearance in general, such as Xenon Arc (subjecting test panels to intense radiation), QUV (subjecting test panels to high ultra-violet light and condensing humidity cycles), EMMAQUA (placing test panels on racks that rotate with the sun to provide maximum UV light exposure), and humidity tests (subjecting test panels to 100% relative humidity at 100°F for several weeks);

b.  long-term outdoor weathering tests, where test panels are placed on so called "test fences" at 45-degrees facing south (according to ASTM standards) in various environments, such as Florida (high UV light,

humidity, and salt spray), Arizona (intense UV light and temperature), and industrial sites (high pollutants such as acid rain and various chemicals);

c. corrosion resistance tests, including salt spray (subjecting test panels to 5 wt. salt spray at 95°F for several weeks), cyclic corrosion (subjecting test panels to various cycles of salt spray, humidity, wet/dry, temperature), condensing humidity (subjecting test panels to temperature cycling in highly saturated air, CASS (subjecting test panels to salt spray with added acetic acid for accelerated testing), and Kesternich (subjecting test panels to acid rain simulation);

d. physical and mechanical tests, including flexibility, impact resistance, abrasion resistance, scratch and mar resistance, coating thickness, adhesion, and hot and cold cycling; and

e. chemical properties testing, including resistance to solvents, chemicals, and various fluids the vehicle will likely encounter in the open environment.

118.   In addition, Defendant did or should have performed several of the above-described ASTM and SAE test procedures.

119.   Defendant has developed and publicized what is referred to as "GM SAE Standards & Testing" that are used in connection with the testing of its vehicles, including GM 4350M for a test relating to the "Painted Part Performance

Requirement," GM 9200P "Accelerated Aging and Steaming," GM 9505P "Automotive Environmental Cycles," GM 9540P "Accelerated Corrosion Test," GMW 14669 "Organic Coating/Finish Performance for Exterior and Interior Metallic Materials," as well as various other tests relating to the performance of the paint used on its vehicles, including the Class Vehicles, in simulated real-world conditions. Applied Technical Services, GM SAE Standards & Testing, https://atslab.com/wp-content/uploads/2019/03/GM-SAE-Automotive-Spec-Combined.pdf (last visited February 11, 2022).

120. ███████████████████████████████████

████████████████████████████████████████

████████████████ Exh. 9 (GM000172066).

121. The development of the paint and the paint system, including the testing performed in connection therewith, would have revealed the paint defect. The details regarding the testing performed by Defendant and the results of that testing are in the exclusive custody and control of Defendant.

122. If Defendants conducted the proper standard testing, the defects would have become apparent to Defendant because these tests are designed to accelerate the normal aging process of vehicles such that during these tests Defendants would have discovered in a short period of time that the paint was defective.

123.    If Defendant actually conducted these standard tests, Defendant would have been put on notice of the defect and because it did not disclose the defect to Plaintiffs and the putative class it must have actively concealed it.

124.    If Defendant did not conduct these standard tests, it did so knowing that it was against its own procedures and industry standards.

125.    On information and belief, prior to the manufacture and sale of the Class Vehicles, Defendant knew of the paint defect through, or as evidenced by, sources such as pre-release design and testing information; technical service bulletins; service center data; early consumer complaints made directly to Defendant, collected by NHTSA ODI, and/or posted on public online vehicle owner forums; testing done, including testing in response to consumer complaints; aggregate data from Defendant's dealers; and other internal sources unavailable to Plaintiffs and Class without discovery.

126.    Defendant monitors public online vehicle owner forums and responds to putative class member complaints and at least for www.chevroletforum.com, they have done so since at least 2010 and in approximately four years from 2010 to 2014, Defendant made 4,167 posts!  Their last activity on www.chevroletforum.com was April 14, 2021.    https://chevroletforum.com/forum/tahoe-suburban-diy-useful-threads-61/paint-peeling-off-2012-suburban-gm-said-not-under-warranty-60366/

127.    Defendant also monitors YouTube videos, like the one below, and posts information on YouTube since at least 2006. https://www.youtube.com/c/Chevrolet/about





| 📄 July 24th, 2014, 9:52 AM | #10 |
|---|---|

**Chevrolet Customer Service**
**Official GM Rep**

Join Date: Mar 2010
Location: Global
Headquarters in Detroit, MI
Posts: 4,167
Likes: 0
Received 18 Likes on 16
Posts

Hello,

We do apologize for the frustrations you have experienced. You are welcome to send us your name, address, phone number, VIN, mileage, and name of preferred dealership through a private message; however, we cannot guarantee that cost assistance will be provided for repairs due to the age of the vehicle.

Jessica
Chevrolet Customer Care

# Chevrolet Customer Service

## Official GM Rep

**Send Message ▾**

Last Activity: April 14th, 2021 4:31 PM

**About Me** | Statistics | Social Profiles | Friends

### About Chevrolet Customer Service

**Location**

Global Headquarters in Detroit, MI

**Vehicle(s)**

GM vehicles

**Occupation**

Chevrolet Customer Care Team

**Signature**

Check out the NEW Owner Center at: My.Chevrolet.com

For information on the GM Privacy Statement, please visit http://www.gm.com/privacy-statement.html

**B.** **The Paint Defect in Class Vehicles is Widespread**

128. ██████████████████████████████████████████████

████████████████████████████████████████. Exh. 10 (GM000163423 – ████████

████████████████████████████████████████████████████████████

████████████████████████████0).

129. ███████████████████████████████████████████████

███████████████████████████████████████ Exh. 11 (GM000163419).

130. ███████████████████████████████████████████████

█████████████████████████████████████████████████xh.  12

(GM000172112).

131. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

132. ███████████████████████████████████████████████

███████████████████████████████████████████████. Exh.  8

(GM000172764 – filtered spreadsheet confirming ████████████████████

██████████████.

133. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

134. ███████████████████████████████████████

████████████████████████████████████████████

**C.   Prior to the Natural Expiration of Plaintiffs' New Vehicle Limited Warranty, Defendant Knew that the Arlington Assembly Plaint Paint Process Was Flawed Yet Continued to Conceal It For More than Six Years**

135.  Defendant actively and willfully concealed the paint defect precluding Plaintiffs from bringing any claim against it until more than four years after their purchases.

136. ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████ Exh. 2 at 893 (GM000171890).

137. ███████████████████████████████████████

████████████████████████████████████████████

██████████. Exh. 1 at 153:6-14 (Hodapp Dep.).

138. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ Exh. 2 at 893 (GM000171890 - ████████

████████████████████████████████████████████

139.  Indeed, as of the natural termination of the New Vehicle Limited Warranty, Riley's Class Vehicle had yet to manifest the paint defect and thus

without knowledge of the defect, could not bring a cause of action against Defendant.

140. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ Exh. 2 at 893 (GM000171890).

141. ████████████████████████████████

████████" *Id.*

142. ████████████████████████████████

████████████████. *Id.*

143. ████████████████████████████████

████████████████████████████████████████

███████████████████████████████ Exh. 4 at 506 (GM000162503 - "████████████████████████████████

████████████████████████████████████")

144. ████████████████████████████████

████████████████████████ *Id.* at 505.

145. While Defendant knew of the paint defect, it failed to inform internal paint experts and its paint supplier, actively concealing from them and the public.

146. ████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████ Exh. 20 at 132:21-134:12 (Dziatczak Dep.).

147. ████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████ Exh. 11 (GM000163419).

148. ████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████" *Id.*

149. ████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████



███. *See* Exh. 13 (GM000170076), Exh. 14 (GM000170103), Exh. 15 (GM000170112), & Exh. 16 (GM000170155 - ███████████████████████ ████████████████████).

150. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

concealing from the public the fact of the paint defect. Exh. 17 (GM000166841).

151. ███████████████████████████████████████████

███████████████████████████████████████████

██████████████████ Exh. 18 (GM000166916).

152. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████Exh. 19 (GM000168135).

**D.** **Defendant Knew that Paint Defects Were Prevalent in Their Vehicles**

153.    Defendant also knew or should have known about the potential for paint defects based upon complaints made on the prior version of the Chevrolet Suburban:

a. 9/2/2013: "Paint peeling off of 2012 Suburban and GM said not under warranty: Purchased a new 2012 Suburban off of the dealers lot this past

40

February while we were in Florida… I now have about 5200 miles on it.
It is garage kept here in IL… Paint just peeled off the plastic panel in a 3"
diameter circle. I saved the pieces to show my Chevy dealer here in IL…
we ran our hands over the paint and it has a ripple in it… I was told it was
not warranty work. But they would not put that in the computer and print
it our for me. I called GM Care at least 15 times before they returned my
call."        https://chevroletforum.com/forum/tahoe-suburban-diy-useful-
threads-61/paint-peeling-off-2012-suburban-gm-said-not-under-
warranty-60366/

b. 9/4/2013: "GMC paint problem: GM has had a problem with the hood and
roof paint flaking for years. I thought I would publish this video to
demonstrate how poor the response is from GM to fix problems. The
instrument panels in the Yukon, the Silverado and many others is another
demonstration of the pathetic service  that GM delivers.  They purposely
wait for the average consumer to drive past the mileage cap before they
offer a recall or a solution to the problem they have known about for some
time. This is the way that you repay the taxpayers who bailed you out?
Shame on you GM! You are an embarrassment to American made

products!"              https://www.youtube.com/watch?v=HdFuzNyXwt8



### E.  Defendant Knew of the Paint Defect from Class Member Complaints Made Directly to Defendant as Well As Posted Online

154.    Defendant also knew or should have known about the paint defect based on complaints made directly to Defendant. The large number of complaints, and the consistency of their descriptions of peeling, cracking, becoming cloudy, blistering, flaking, delaminating, and bubbling caused by the defective paint and/or clear coat, alerted or should have alerted Defendant to this substantial defect affecting a wide range of its vehicles.

42

155.    However, many Class Vehicle owners complained directly to Defendant and Defendant's authorized dealerships about the paint issues they experienced. The number and consistency of these complaints should have alerted Defendant to the existence of the paint defect and some of these are reproduced below:

- 10/20/2020: "2015 Chevrolet Tahoe: ~tl- the contact owns a 2015 Chevrolet Tahoe. The contact stated that the paint on the engine hood is peeling off. The vehicle was taken to local dealer camino real Chevrolet (2401 s atlantic blvd, monterey park, CA 91754 (323) 264-3050) where it was not diagnosed. The manufacturer had not been informed of failure. The failure mileage was approximately                    69,000.                    Dl."
https://www.carproblemzoo.com/chevrolet/tahoe/paint-problems.php

- 5/1/2020: "2016 Chevrolet Tahoe: I have a 2016 Tahoe that I purchased new from dealer. I had also purchased a protection plan with finishing touch that they talked us into when we bought the car on the paint and interior. 3. 5 years into ownership the paint on the hood and roof faded. We contacted the protection plan and they were more than willing to take care of. They sent an adjuster out and he classified as clear coat failure. Then the run around started. I contacted Chevrolet and I contacted the dealership. We took the car to the dealership and talked with the assistant manager in the service department. He brought out the manager and he confirmed that it was paint failure. So then the dealership gets involved with Chevrolet. The first call comes back and says they will cover 20%. I told them that some one was going to cover the repairs and it won't be me. They sold me a protection plan through finishing touch for the paint and the interior so someone needs to cover the damage. After a few days I get a call stating that between the dealership, Chevrolet and finishing touch it would be repaired at no cost. � now it gets better. We took the vehicle back to the dealership to have the hood and the roof repainted. After a week at the body shop the car is ready to be picked up. We walk up to the car and it is all shiny and looking good. But the color doesn't match. We call the service manager out and he says he can't see the issue. The Tahoe is a

brownstone metallic and the hood is more bronze than the rest of the vehicle. He tells me he can get the paint manager to come speak to me because he can't see the problem. This is a overcast day so it doesn't show really bright but my husband and I can see the difference. While we are waiting for the manager from the body shop to arrive we walk around the vehicle. Dealership states Chevrolet will not blend the paint to match." https://www.carproblemzoo.com/chevrolet/tahoe/paint-problems.php

- 11/1/2018: "2016 Chevrolet Tahoe: The exterior paint starting fading, clear coat not holding up." https://www.carproblemzoo.com/chevrolet/tahoe/paint-problems.php

- 1/6/2019: "We purchased a certified pre-owned 2015 Suburban at the end of last year. It was shiny and pristine at the dealership. Within two months of having it home, we notice the paint on the hood and roof looked dull and like the paint was swirled. We had it detailed and were advised by the detailer that he felt the paint was defective.   The vehicle had approx 30,000 miles on it when we bought it.  While we didn't expect it to be 100% unblemished, we never expected the paint on the hood and roof to completely fail.  It was disguised with wax apparently when it was on the lot.

  Since then, we have been in touch with the dealership that sold us the vehicle, GM corporate, and our local dealership. The dealership where we purchased the vehicle has told us that they will do nothing to assist us. This was in January of this year, well before the warranty was up, not even two months after we purchased it.   We do not feel this is a warranty issue anyway but rather a defect." https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/

- 9/30/2019: "Our 2015 Suburban is doing the exact same thing, we are getting a run around.  Chevy says it not their problem/fault, our dealer said to go to Chevy.  Chevy corporate online said to go to the local dealer, the polyshield we had put on doesn't cover the paint "cracking".  So we are where you are, what did you do and how did you get it fixed.  We are going to go get estimates at auto shops next week." https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/

- 10/11/2019: "I just emailed the person in the original post about this. My 2015 Yukon is doing the same thing and looks like a 20 year old car. We are getting the same responses from our dealership and GM. We have got to get something done about this! These $70K vehicles should not be doing this!!!!" https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/
- 11/4/2019: "I have the same paint issue on a 2014 Yukon.  Its been like this for some time.  About 18 months ago I have the dealer look at it.  They and GMC declined to do anything about it." https://www.gm-trucks.com/forums/topic/218275-defective-paint-2015-suburban/
- 8/1/2018" The coups de gras, which was the final straw is when the top coat on the hood and top of Tahoe started to fade/grey and crack on the black undercoat. To fix the top coat, the dealership wanted $2300.00; of which they were going to pick up 10% of after my pushing for warranty. The Tahoe is 3 years old. The paint should last well into a decade, and I kept the car washed weekly and detailed every 6 months. This expense after all the cost for the AC repairs and replacement cost for several external brackets and trim that broke within                    3                    years." https://www.carcomplaints.com/Chevrolet/Tahoe/2015/body_paint/clear_coat_fading_and_cracking.shtml
- 6/12/2018: "I've started to develop more of the Clear Coat Peeling on the rear drivers side of the bed. This time, I'm calling the 800 number and I'm gonna open a support ticket. I'm fearful of the longevity of the paint. I feel like I'm getting screwed. I love my '17 but I hate the cosmetic issues it has been developing. I've got 10k miles left to the 36k miles and I'm not even in the second year owning the truck yet." https://www.gm-trucks.com/forums/topic/212696-peeling-clear-coat/

156.     Further, knowledge of the defect is evidenced by recognition of an issue with the paint by each Defendant employee Plaintiffs spoke with about their vehicle's paint issues when they complained directly to Defendant.

157.     As shown by this small sampling of complaints from forums and websites such as www.carproblemzoo.com, www.carcomplaints.com, www.gm-trucks.com, and www.tahoeyukonforum.com, consumers have been vocal in complaining about the paint defect and the damage it has caused.  A multi-billion dollar vehicle design and manufacturing company such as Defendant undoubtedly tracks and has tracked such sites and was aware or should reasonably have been aware of the paint defect in the Class Vehicles.

158.     In sum, Defendant has actively concealed the existence and nature of the paint defects from Plaintiffs and the putative class since at least 2014 (and certainly before the date that Plaintiffs purchased their Class Vehicles) despite its knowledge of the existence and pervasiveness of the paint defect, and certainly well before Plaintiffs and the putative class purchased their Class Vehicles.

159.     Specifically, Defendant has:

a.  failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the paint defect;

b.  failed to disclose, at and after the time of purchase, lease, and/or service, that the paint and paint process used on the Class Vehicles were defective and not fit for their intended purposes;

c.  failed to disclose, and actively concealed, the fact that the paint and/or the paint process used on the Class Vehicles were defective, despite the fact that Defendant learned of the paint defect as early as 2014, and likely even earlier;

d.  failed to disclose, and actively concealed, the existence and pervasiveness of the paint defect even when directly asked about it by Class members during communications with Defendant, Defendant Customer Assistance, Defendant's authorized dealerships, and Defendant's authorized service centers;

e.  actively concealed the paint defect by forcing Class members to bear the cost of repainting, while at the same time performing those services at no (or lower) cost for those who complained vocally and often;

f.  actively concealed the paint defect by inadequately repainting the Class Vehicles, so that the paint defect has never been permanently corrected in the Class Vehicles, even though Plaintiffs and the putative class were led to believe that the services would cure, and, in fact, had cured the paint defect in their Class Vehicles;

g.  actively concealed the paint defect by knowingly repainting the Class Vehicles with the same paint, clear coat, and paint process, while knowing and concealing that repainting the Class Vehicles would not prevent and/or

cure the problems associated with the paint defect because the paint used on the Class Vehicles remained defectively designed; and

h.  actively concealed the paint defect by knowingly repainting the Class Vehicles with defective paint using the same paint process, while knowing and concealing that repainting the Vehicles would not prevent and/or cure the problems associated with the paint defect because the process by which the paint was applied to the Class Vehicles remained defective.

### F.  <u>Defendant Knew of the Paint Defect from Repair Data.</u>

160.  Defendant also knew or should have known about the paint defect because of the large number of repainting and repair jobs it performed on Class Vehicles due to peeling, cracking, becoming cloudy, blistering, delaminating, and bubbling.

161.   Exh. 8 (GM000172764 –

162.  For instance, in the Fall of 2018, Defendant acknowledged that the paint defect with Ambrose's Class Vehicle's was "common to all Yukons."

163.  Defendant collects, reviews, and analyzes detailed information about repairs made on vehicles at its dealerships and service centers, including the type

and frequency of such repairs.  This information was produced and is referenced *supra*.

## INADEQUATE REMEDY

164.     As evidenced by the experiences of Plaintiffs and the estimates they have received after their Class Vehicles experienced the paint defects, repainting the Class Vehicles (when and if Defendant agrees to do so), even if done properly, does not cure the paint defect and does not remedy the diminution of value that occurs as a result of the repainting.

165.     For all the Class Vehicles, the factory paint was supposed to be applied by robots to exacting tolerances consistently over all body panels—a point highlighted by Defendant when marketing the Class Vehicles to customers—whereas Defendant's repair process is haphazard at best and results in paint inconsistencies relative to appearance and longevity.

166.     Indeed, the repainting of a Class Vehicle at numerous local repair shops could never achieve the same finish that is produced during the original painting of it given the equipment and methods used by Defendant in the paint system that is applied to the pristine body of a Class Vehicle, not to mention the pristine and strictly controlled environment in which the paint system is applied.

167.     The environment in which the Class Vehicles are repaired, and the limitations of body shops, including those who are certified by Defendant, that all

but assures that the quality of re-painting can never be as good as the original paint job. Defendant knew that the repair procedures were inadequate at the time they were first implemented, especially in light of the environmental and technical limitations of the body shops it authorized to perform such repairs, yet concealed that fact from Plaintiffs and the putative class.

168.    Even if the Class Vehicles were properly repainted, their values would still be diminished, as repainted newer vehicles are worth less than vehicles with original paint. Indeed, there is a stigma associated with a repainted vehicle, especially from a luxury brand like Defendant, and the fact that a vehicle has been repainted is often used by a potential buyer as a bargaining chip to lower the price.

169.    In addition, anticipated car purchasers often shy away from a vehicle that has been repainted, as it rings alarm bells that the vehicle may have been damaged in an accident and repainted as a result. A non-original paint job could also be an indication of major body repairs to the Class Vehicle that are being hidden, not to mention rust.

170.    According to an online poll conducted by CarMax, 72% of respondents said that repainting the car is the strongest indicator of vehicle damage. In fact, CarMax states that repainting is one of the biggest warning signs indicating a vehicle may have been in a major accident, and instructs consumers to do the following in order to determine whether a used car may have been in a serious accident:

Look for signs of repainting on the car, such as inconsistency in the paintwork or paint on the molding or gaskets. Run your finger along the inside of the door edge and see if the finish is smooth or rough. A rough finish can be caused by overspray during repainting. If signs of repainting are found, ask additional questions to determine if the paintwork was for minor scratches and dents or to cover up more serious vehicle damage.

171.    Paint work to a vehicle typically shows up on a CARFAX Vehicle History Report, as such repairs are often reported by the dealerships or body shops performing them. Even if it is not, paint work can easily be identified through the use of a paint meter, which are used by dealers when evaluating vehicles for trade-in purposes. In the case of the Class Vehicles, given the nature of the paint defect and the inadequate repainting of the Class Vehicles, the paint work can be identified by potential buyers with the naked eye and without the use of a paint meter.

172.    Kelley Blue Book ("KBB") similarly bases its appraisals on the condition of the vehicle. KBB divides the condition of used vehicles into the following four grades:

**Excellent** condition means that the *vehicle looks new*, is in excellent mechanical condition and needs no reconditioning. *This vehicle has never had any paint or body work* and is free of rust. The vehicle has a clean Title History and will pass a smog and safety inspection. The engine compartment is clean, with no fluid leaks and is free of any wear or visible defects. The vehicle also has complete and verifiable service records. Less than 5 percent of all used vehicles fall into this category.

**Good** condition means that the vehicle is *free of any major defects*. This vehicle has a clean Title History, the paint, *body and interior have only minor (if any) blemishes*, and there are no major mechanical problems. There should be little or no rust on

this vehicle. The tires match and have substantial tread wear left. A "good" vehicle will need some reconditioning to be sold at retail. Most consumer owned vehicles fall into this category.

**Fair** condition means that the *vehicle has some* mechanical or *cosmetic defects* and needs servicing but is still in reasonable running condition. This vehicle has a clean Title History, *the paint, body* and/or interior *need work performed by a professional*. The tires may need to be replaced. There may be some repairable rust damage.

**Poor** condition means that the *vehicle has severe* mechanical and/or *cosmetic defects* and is in poor running condition. The vehicle may have problems that cannot be readily fixed such as a damaged frame or a rusted-through body. A vehicle with a branded title (salvage, flood, etc.) or unsubstantiated mileage is considered "poor." A vehicle in poor condition may require an independent appraisal to determine its value.

173.    According to KBB's online Condition Quiz, vehicles that have extensive paintwork and no paint damage are considered to be, at most, in "Good" condition, while vehicles that have no paintwork and extensive paint damage are considered to be, at most, in "Fair" condition.

## **PLAINTIFFS WERE DAMAGED BY THE PAINT DEFECT**

174.    Plaintiffs and the putative class purchased or leased the Class Vehicles based on their reasonable but mistaken belief that their Class Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by Defendant were not those for which Plaintiffs and the putative class bargained. Rather, the Class Vehicles suffered from a common defect – the paint defect. Had Plaintiffs and the putative class known of the paint defect, they would have either:

(a) paid substantially less for the Class Vehicles; (b) required an immediate remedy that restored the Class Vehicles to the conditions bargained for; or (c) not purchased or leased the Class Vehicles.

175.     As a result of the disparity between the quality of the Class Vehicles negotiated for and the Class Vehicles actually received, Plaintiffs and the putative class suffered economic harm.

176.     This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that remedy); (b) the discount that Plaintiffs and the putative class would have required to accept the Class Vehicles in their actual condition; and/or (c) the diminished value of the Class Vehicles, both those that have been repainted and those that have not.

177.     Plaintiffs and the putative class paid premiums to purchase and lease the Class Vehicles as a result of the brand, quality, durability, and value representations made by Defendant. A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Paint Defect. Plaintiffs and the putative class were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for – a high-quality and durable vehicle that would retain its value under normal conditions.

178.     As a direct result of Defendant's misrepresentations and omissions, Plaintiffs and the putative class overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiffs and the putative class paid a premium for the Class Vehicles, which Defendant advertised as being durable and of high-quality, and received Class Vehicles that contained a known but concealed defect. Defendant was unjustly enriched because it obtained and retained monies paid by Plaintiffs and the putative class who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

179.     In addition, the widespread disclosure of the paint defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiffs and the putative class have suffered a direct pecuniary loss in the form of the decreased value of their Class Vehicles, even when the Paint Defect has not yet manifested.

180.     As a result of Defendant's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose the Paint Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

181.     Plaintiffs and the other Class members were injured as a result of Defendant's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value, whether they are re-painted or not.

These injuries are the direct and natural consequence of Defendant's misrepresentations and omissions.

## ADDITIONAL FRAUDULENT CONCEALMENT FACTS DETAILED

182.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Defendant responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles. Defendant necessarily is in possession of, or has access to, all of this information.  Plaintiffs are, however, able to provide sufficient specificity on the concealment, as set forth herein.

183.    Defendant owed a duty to Plaintiffs and the putative class to disclose to them what was known about the paint defects as soon as they were known. Defendant knew that Plaintiffs and the putative class chose Defendant's brand intentionally and for the purpose of displaying their luxury vehicles.  Because of the particular nature of Plaintiffs and the putative class who affirmatively chose Defendant's brand, Defendant were on notice that the Plaintiffs and the putative class expected certain qualities from the paint.

184.    Plaintiffs' claims arise out of Defendant's fraudulent active and willful concealment of the paint defect and the peeling, cracking, becoming cloudy, flaking, delamination, and bubbling of the Class Vehicles' paint it causes, and its

representations about the quality, durability, and value of the Class Vehicles, including the paint used on the Class Vehicles.

185.    To the extent that Plaintiffs' claims arise from Defendant's fraudulent concealment, there is not one document or communication, and not one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased their Class Vehicles, Defendant knew, or was reckless in not knowing, of the paint defect; Defendant was under a duty to disclose the paint defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and Defendant never disclosed the paint defect to Plaintiffs or the public at any time or place or in any manner.

186.    Plaintiffs make the following specific fraud allegations with as much specificity as possible although they do not have access to all the information necessarily available only to Defendant as discovery is ongoing:

a. **Who**: Defendant actively concealed the paint defect from Plaintiffs and the putative class while simultaneously touting the quality and durability of the Class  Vehicles, as alleged, *supra*. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Defendant responsible for such decisions but upon information and belief

understand them to be employees within the sales and marketing division of Defendant.

b. **What**: Defendant knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the paint defect, as alleged, *supra*. Defendant concealed the paint defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles, as alleged, *supra*.

c. **When**: Defendant actively and willfully concealed material information regarding the paint defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than 2014, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day, as alleged, *supra*. Defendant has not disclosed the truth about the paint defect in the Class Vehicles to anyone outside of Defendant. Defendant has never taken any action to inform consumers, and has actively and willfully concealed, about the true nature of the paint defect in Class Vehicles. And when consumers brought their Class Vehicles to Defendant complaining of the clearcoat peeling, cracking, becoming cloudy, flaking, delaminating, or bubbling off of their Class Vehicles, Defendant denied any knowledge of, or responsibility for, the paint defect, and in many instances, actually blamed owners/lessees for causing the problem.

d. ***Where***: Defendant concealed material information regarding the true nature of the paint defect in every communication it had with Plaintiffs and the putative class and made contrary representations about the quality and durability of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing in which Defendant disclosed the truth about the paint defect in the Class Vehicles to anyone outside of Defendant. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on Defendant's website.

e. ***How***: Defendant concealed the paint defect from Plaintiffs and the putative class and made representations about the quality and durability of the Class Vehicles. Defendant actively concealed the truth about the existence and nature of the paint defect from Plaintiffs and the putative class at all times, even though it knew about the paint defect and knew that information about the paint defect would be important to a reasonable consumer, and Defendant promised in its marketing materials that the Class Vehicles have qualities that they do not have.

f. ***Why***: Defendant actively concealed material information about the paint defect in Class Vehicles for the purpose of inducing Plaintiffs and the putative class to purchase or lease Class Vehicles, rather than purchasing or leasing

competitors' vehicles and made representations about the quality and durability of the Class Vehicles. Had Defendant disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

187.    Had Defendant disclosed the paint defects to Plaintiffs and the putative class, they would not have been damaged, as alleged *supra*, as they would not have purchased or leased their Class Vehicles.  Each Plaintiff and the putative class, because of the nature of the Class Vehicles as luxury and special vehicles, would have been in a position, whether via advertising, marketing, research or otherwise to have learned of Defendant's disclosures concerning the paint defects.

188.    Further, had Defendant disclosed the paint defects, the asking price or sticker price of the Class Vehicles would have been considerably less than other colored Defendant cars of similar vintage and mileage thereby putting Plaintiffs and the putative class in a position to learn of the paint defect prior to purchase or lease. The Class Vehicles would also have been less than comparable competitors' cars thereby putting Plaintiffs and the putative class in a position to learn of the paint defect prior to purchase or lease.

## TOLLING OF THE STATUTE OF LIMITATIONS

189.    Defendant, until March 7, 2023, actively, willfully, and successfully concealed Plaintiffs' right to bring suit against it by publicly claiming that Plaintiffs had no damage and that the paint issue they experienced was the Plaintiffs' fault.

190.    Defendant concealed this all the while knowing that the paint defect did not manifest itself until ████████████████████████ " Exh. 2 at 893 (GM000171890), allowing Defendant to escape liability by arguing that a four year statute of limitations period applies to Plaintiffs' claims.

191.    Defendant knowingly and intentionally waited until more than four years after manufacturing to admit this so as to preclude Plaintiffs from bringing their causes of action.

192.    As shown *supra*, ¶¶ 102-152, Defendant knew of the paint defect, yet took affirmative steps to conceal it from Plaintiffs and the Class thereby precluding them from bringing a claim against Defendant.

193.    Defendant was deceitful and fraudulent, as shown *supra*, ¶¶ 102-152, because it took affirmative steps to conceal the defect and cause of action from Plaintiffs and the Class in an effort to escape liability.

194.    Disclosure of the defect by the Defendant would have undermined its marketing goal to sell as many Class Vehicles as possible.  This marketing and promotional campaign was underway during the time that the defect was concealed.

This shows, circumstantially at least, that Defendant's concealment to protect its sales and that it did so actively and willfully.

195.    Defendant maintained this active and willful concealment for more than eight years.

196.    Indeed, it was not until the March 7, 2023 deposition of Ms. Hodapp and the March 16, 2023 deposition of Mr. Dziatczak that Defendant first revealed to Plaintiffs' their causes of action, but Defendant still has not publicly revealed them.

197.    On March 7, 2023, Defendant, through its paint executive Ms. Hodapp, ██████████████████████████████████████████████" Exh. 1 at 78:5-80:19 (Hodapp Dep. – ██████████████████████████████ ████████████████████████████████████████████ ████████████████, thus giving rise to the cause of action.

198.    Also, at the March 16, 2023 deposition of Mike Dziatczak, ███████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████" Exh. 20 (Dziatczak Dep. at 122:23-123:3).  Prior to this date, Defendant blamed Plaintiffs and the Class for some type of "environmental" exposure or customer neglect.  By making Plaintiffs and the Class believe the paint issues were their fault, Defendant

actively and fraudulently prevented Plaintiffs and the Class from determining the existence of their causes of action.

199.     Plaintiffs and the Class, as reasonable consumers, were careful in the maintenance of their paint, properly stored their Class vehicles, and routinely monitored their Class Vehicles for paint issues.

200.     Indeed, Plaintiffs were diligent in their investigations of their paint issues but were stymied by Defendant's concealment and active false statements – such as the paint issues were due to Plaintiffs' neglect or that outside "environmental" factors caused the paint issues.

## CLASS ACTION ALLEGATIONS

201.     Plaintiffs bring this action on behalf of themselves and others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23. The Class which Plaintiffs seek to represent is composed of and defined as (collectively "Class"):

    a.  All consumers who purchased or leased a Class Vehicle in Florida, inclusive of all such consumers residing anywhere in the United States;

202.     The following persons are excluded from the definition of the Class:

    a.  U.S. District Court judges, magistrate judges of any U.S. District Court, judges of the U.S. Court of Appeals for the Eleventh Circuit, and U.S.

District Court personnel having any involvement with administration and/or adjudication of this lawsuit;

b.  Class counsel and their employees; and

c.  Employees of Defendant.

203.    This action has been brought and may properly be maintained as a Class action pursuant to the provisions of the Federal Rules of Civil Procedure, for these reasons:

a.  Members of the Class are geographically distributed throughout the United States and exceed 1,000 in total so that their joinder is impractical; and

b.  Common questions of law or fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.

c.  Plaintiffs' claims are typical of the claims of the members of the Class under Federal Rule of Civil Procedure 23. Each member of the Class either owns, owned, leases, or leased a Class Vehicle.

d.  Plaintiffs will fairly and adequately protect the interest of the Class as required by Federal Rule of Civil Procedure 23. Plaintiffs have no interests which are adverse to the interest of the Class. They have retained counsel who has substantial experience in the prosecution of Class actions.

e.  The prosecution of separate actions by individual members of the Class would create the risk of (i) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendant; or (ii) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interest of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interest.

f.  Pursuant to Federal Rule of Civil Procedure 23(b)(2), Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and Class, causing injury to them and making Class-wide relief appropriate, specifically declaratory and injunctive relief.

g.  The questions of law or fact common to the Class predominate over questions affecting only individual members. A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy under Federal Rule of Civil Procedure 23. The harm suffered by many individual members of the Class may not be great enough to warrant the expense and burden of individual litigation, which would make it difficult or impossible for individual members of the Class to redress the wrongs done to them. Individualized litigation would also

present the potential for inconsistent or contradictory judgments and would magnify the delay and expense to all parties and the court system in multiple trials of the complex factual issues of the case. By contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each Class member.

**COUNT ONE**
**(Breach of Express Warranty)**
**(For the Class)**

204.   Plaintiffs, individually and for the Class, hereby incorporate by reference the paragraphs above as though fully restated herein.

205.   For each Class Vehicle, an express written warranty was issued that covered the vehicle, including but not limited to the exterior paint, and warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

206.   Each Plaintiff gave notice to Defendant of breach of warranty and demanded repair of the paint defect.

207.   Defendant breached its warranties by offering for sale and selling defective vehicles, specifically vehicles with paint that was defective and was defectively applied, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

208.     Defendant further issued an express written warranty to the original owner, and each subsequent owner, that Defendant would make any repairs or replacements necessary to correct defects in material or workmanship arising during the warranty period, without cost.

209.     Defendant breached its warranties by refusing to repair or repaint the Class Vehicles for latent defects which arose during the warranty period or refusing to do so without charge to the owners.

210.     Defendant's breach of its express warranties proximately caused the Class to suffer damages in excess of $5,000,000.00.

211.     Plaintiffs and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendant's wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiffs and the Class may be entitled.

## COUNT TWO
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.)
### (Individually for Riley and Ambrose)

212.     Plaintiffs, individually and for the Class, hereby incorporate by reference the paragraphs above as though fully restated herein.

213.    For each Class Vehicle, Defendant issued an express written warranty that covered the vehicle, including but not limited to the exterior surfaces, and warranted the vehicle to be free of defects in materials and workmanship at the time of delivery.

214.    Defendant breached its express warranties by offering for sale and selling defective vehicles that contained paint that was defective and was defectively applied, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

215.    Plaintiffs and members of the Classes are "consumers" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(3).

216.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(4) and (5).

217.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(6).

218.    Defendant's express warranties relate to the future performance of its vehicles because it promised that the Class Vehicles would perform adequately for a specified period of time or mileage, whichever came first.

219.    Defendant has breached and continues to breach its express warranties of future performance, thereby damaging Plaintiffs and Class members when their Class Vehicles fail to perform as represented due to an undisclosed paint defect.

Defendant failed and refuses to fully cover or pay for necessary inspections, repairs, and/or vehicle replacements for Plaintiffs and the Class.

220.    Plaintiffs, members of the Class, and the public will suffer irreparable harm if Defendant is not ordered to properly repair all of the Class Vehicles immediately, offer rescission to the Class by repurchasing their Class Vehicles for their full cost, reimburse the lessees of the Class Vehicles the monies they have paid toward their leases, recall all defective vehicles that are equipped with the defective paint, and cease and desist from marketing, advertising, selling, and leasing the Class Vehicles.

221.    Defendant is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

222.    Such irreparable harm includes but is not limited to likely injuries as a result of the defects to the Class Vehicles.

223.    Plaintiffs and the Class seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, and appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Defendant's wrongful acts and practices, restitution, the repair of all Class vehicles, replacement of all Class Vehicles, the refund of money paid to own or lease all Class Vehicles, and any other relief to which Pinon and the Class may be entitled. That relief is in excess of $5,000,000.00.

**COUNT THREE**
**(Violation of Florida's Unfair and Deceptive Trade Practices Act,**
**"FUDTPA")**
**(For the Class)**

224.     Plaintiffs, individually and for the Class, hereby incorporate by reference the paragraphs above as though fully restated herein.

225.     Plaintiffs and the Class members are "consumers" within the meaning of FLA. STAT. §501.203(7), and they purchased or leased Class Vehicles in Florida.

226.     Defendant is engaged in "trade" or "commerce" within the meaning of FLA. STAT. §501.203(8).

227.     The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. §501.204(1).

228.     Defendant violated FDUPTA by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint used on the Class Vehicles. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles,

Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by FLA. STAT. §501.204(1):

    a.  representing that the Class Vehicles have characteristics or benefits that they do not have;

    b.  representing that the Class Vehicles are of a particular standard and quality when they are not;

    c.  advertising the Class Vehicles with the intent not to sell them as advertised;

    d.  engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

    e.  using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale or lease of the Class Vehicles.

229.    At all times relevant, Defendant knew that it was designing, manufacturing, distributing, selling, and warranting Class Vehicles in Florida and throughout the United States that contained defective paint.

230.    Defendant's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and Class, and Defendant misrepresented,

concealed, or failed to disclose the truth with the intention that Plaintiffs and Class would rely on the misrepresentations, concealments, and omissions.

231.    Had they known the truth, Plaintiffs and the Class would not have purchased or leased the Class Vehicles or would have paid significantly less for them.

232.    Plaintiffs and the Class had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

233.    Defendant had an ongoing duty to Plaintiffs and the Class to refrain from unfair and deceptive practices under FDUTPA in the course of their business.

234.    Defendant owed Plaintiffs and the Class a duty to disclose all the material facts concerning the Class Vehicles because they possessed exclusive knowledge, they intentionally concealed such material facts from Plaintiffs and the Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

235.    Plaintiffs and the Class suffered ascertainable losses and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information. Those injuries exceed $5,000,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request an order and judgment against Defendant which –

1. Certifies the Class and appoints Plaintiffs and their counsel to represent the Class.

2. Awards compensatory damages to Plaintiffs and Class in the utmost amount allowed by law.

3. Awards punitive damages against the Defendant in favor of Plaintiffs and Class in the utmost amount allowed by law.

4. Awards a reasonable attorneys' fees to Plaintiffs and Class, as prescribed by law and for the common and public good obtained in this action.

5. Grants such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## DEMAND FOR A JURY TRIAL

Plaintiffs and the Class hereby demand a trial by struck jury on all issues.

Dated this 10th day of April 2023.

Respectfully submitted,

*/s/ Taylor C. Bartlett*
Taylor C. Bartlett
(pro hac vice)
W. Lewis Garrison, Jr.
(pro hac vice)

HENINGER GARRISON DAVIS, LLC
2224 1st Avenue North
Birmingham, Alabama 35203
Telephone:   (205) 326-3336
Facsimile:    (205) 326-3332
taylor@hgdlawfirm.com
lewis@hgdlawfirm.com

Matthew S. Mokwa (FL# 47761)
Jason R. Fraxedas (FL# 63887)
THE MAHER LAW FIRM, P.A.
398 W. Morse Blvd., Suite 200
Winter Park, FL 32789
Phone: (407) 839-0866
Fax: (407) 425-7958
jrfraxedas@maherlawfirm.com
mmokwa@maherlawfirm.com

Steve Jackson
(pro hac vice)
Jackson & Tucker, P.C.
Black Diamond Building
2229 First Avenue North
Birmingham, AL 35203
Phone: 205-252-3535
Fax: 205-252-3536
steve@jacksonandtucker.com

*Attorneys for Plaintiffs*